Anne L. Weismann
D.C. Bar No. 298190
Melanie Sloan
D.C. Bar No. 434584
Citizens for Responsibility
and Ethics in Washington
1400 Eye Street, N.W.
Suite 450
Washington, D.C. 20005
202-408-5565

Scott A. Hodes
D.C. Bar No. 430375
P.O. Box 42002
Washington, D.C. 20015
301-404-0502

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON 1400 Eye Street, N.W., Suite 450 Washington, D.C. 20005, | : : : : |
| Plaintiff, | : : |
| v. | : Civil Action No. : |
| U.S. DEPARTMENT OF EDUCATION 400 Maryland Ave., S.W. Washington, D.C. 20202, | : : : : |
| Defendant. | : : |

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §

552, as amended, as well as agency FOIA regulations, challenging the failure of the

United States Department of Education ("Education") to fulfill the request of Citizens for

Responsibility and Ethics in Washington ("CREW") for documents relating to Dr. Susan Landry and various programs and entities with which Dr. Landry is associated. This action also challenges as contrary to the FOIA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, Education's pattern and practice of unresponsiveness to CREW's FOIA requests and its refusal to grant CREW a fee waiver.

2. This case seeks declaratory relief that defendant is in violation of the FOIA for failing to fulfill plaintiff's request for records, in violation of the FOIA and agency regulations for failing to grant plaintiff's request for a waiver of fees and injunctive relief that defendant immediately and fully comply with plaintiff's request under the FOIA.

3. Additionally, this action seeks to enjoin Education from its pattern and practice of both refusing CREW's straightforward FOIA requests based on the claim that CREW's requests are not reasonably described in such a way that Education can search for responsive documents, and refusing CREW fee waiver status on such requests.

## JURISDICTION AND VENUE

4. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. § 702, which give the Court jurisdiction over agency actions where an aggrieved party has suffered wrong within the meaning of a "relevant statute," here the FOIA. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue lies in this district under 5 U.S.C. § 703, 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

5. Plaintiff CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of

government officials.  CREW seeks to empower citizens to have an influential voice in

government decisions and in the governmental decision-making process through the

dissemination of information about public officials and their actions.  To advance its

mission, CREW uses a combination of research, litigation, and advocacy.  As part of its

research, CREW uses government records made available to it under the FOIA.

6.  CREW has invested considerable organizational resources in pushing the U.S.

government to take ethics issues seriously.  CREW monitors closely the laws and rules

applicable to government agencies.

7.  CREW is harmed by Education's failure to comply with the FOIA because that

failure harms CREW's ability to provide full, accurate and current information to the

public on a matter of public interest.  5 U.S.C. § 552(a)(6)(c).  Absent this critical

information, CREW cannot advance its mission of educating the public to ensure that the

public continues to have a vital voice in government decisions.

8.  CREW will analyze the information it receives that is responsive to its request,

and will share it with the public through memoranda, reports, or press releases.  In

addition, CREW will disseminate any documents it acquires from its request to the public

through www.governmentdocs.org, an interactive website CREW founded that includes

thousands of pages of public documents from a number of organizations in addition to

CREW.  The CREW website also contains links to thousands of pages of documents

acquired from multiple FOIA requests.  See, e.g.,

http://www.citizensforethics.org/node/25784.  Visitors to CREW's website can peruse

the FOIA request letters, the responses from government agencies, and a growing number

of documents responding to FOIA requests.

3

9.  Defendant Education is an agency within the meaning of 5 U.S.C. § 552(f). Defendant is the federal agency with possession and control of the requested records and is responsible for fulfilling CREW's FOIA request.

## STATUTORY FRAMEWORK

### The Freedom of Information Act

10.  The FOIA, 5 U.S.C. § 552, requires agencies of the federal government to release requested records to the public unless one or more specific statutory exemptions apply.

11.  An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination whether or not to fulfill the request and of the requester's right to appeal the agency's determination to the agency head.  5 U.S.C. § 552(a)(6)(A)(i).

12.  An agency must respond to a FOIA appeal within 20 working days, notifying the appealing party of the agency's determination to either release the withheld records or uphold the denial.  5 U.S.C. § 552(a)(6)(A)(ii).

13.  In "unusual circumstances," an agency may delay its response to a FOIA request or appeal, but must provide notice and must also provide "the date on which a determination is expected to be dispatched."  5 U.S.C. § 552(a)(6)(B).

14.  The FOIA also requires each agency to promulgate regulations specifying a fee schedule for the processing of FOIA requests and establishing procedures and guidelines for the waiver or reduction of fees.  5 U.S.C. § 552(a)(4)(A).  Defendant Education's fee waiver regulations are found at 34 C.F.R. § 5.64.  Under the FOIA, agencies should produce documents at no charge to the requester or at a reduced charge if

4

"disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

15.  This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B).

16.  The FOIA provides a mechanism for disciplinary action against agency officials who have acted inappropriately in withholding records.  Specifically, when requiring the release of improperly withheld records, if the court makes a written finding that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously," a disciplinary investigation is triggered.  5 U.S.C. § 552(a)(4)(F).

**FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF**

17.  On May 11, 2007, CREW sent a FOIA request to Education seeking documents relating to contacts with Dr. Susan Landry and other specified products or entities associated with Dr. Susan Landry.  Letter from Daniel C. Roth, Counsel, CREW, to Office of Management, Regulatory Information Management Services, U.S. Department of Education (May 11, 2007) (attached as Exhibit 1).  Specifically, CREW requested records from January 20, 2001, to the present between officials from Education and those at the (1) Executive Office of the President; (2) White House Office; and (3) Office of the First Lady regarding any and all of the following: (A) Susan Landry or Susan Landry Moore; (B) University of Texas Health Science Center at Houston's Children's Learning Institute; (C) University of Texas Health Science Center at

Houston's Center for Improving the Readiness of Children for Learning and Education

(CIRCLE); (D) Texas State Center for Childhood Development (SCCED); (E) Texas

Early Education Model (TEEM); and/or (E) Wireless Generation's mClASS:CIRCLE

software. Id. at 1.  CREW also specifically requested any communications from January

20, 2001, to the present between officials at Education and:  (A) Susan Landry or Susan

Landry Moore; (B) officials or employees at the University of Texas Health Science

Center at Houston's Children Learning Institute (CLI); (C) officials or employees at the

University of Texas Health Science Center at Houston's Center for Improving the

Readiness of Children for Learning and Education (CIRCLE); (D) officials or employees

at the Texas State Center for Childhood Development (SCECD); and/or (E) officials or

employees at Wireless Generation.  Id. at 1-2.  CREW also requested a waiver of fees

associated with the processing of its request.  Id. at 3.

18.  By letter dated June 20, 2007, Education responded to CREW's FOIA

request, assigning it Request Number 07-00655-F and stating that it could not process the

request as drafted because it did not "describe the records sought with a reasonable

amount of detail such that a Department employee would be able to locate potentially

responsive documents with a reasonable amount of effort."  Letter from Maria-Teresa

Cueva, FOIA Public Liaison, OM/RIMS, U.S. Department of Education, to Daniel C.

Roth, Counsel, CREW (June 20, 2007) at 1-2 (attached as Exhibit 2).  Education also

denied CREW's request for a fee waiver.  Id. at 2-3.

19.  By letter dated July 11, 2007, CREW responded to Education's contention

that the May 11 request did not reasonably describe the records sought.  Letter from

Daniel C. Roth, Counsel, CREW, to Maria-Teresa Cueva, U.S. Department of Education

(July 11, 2007) (attached as Exhibit 3). CREW noted that "[th]e only explanation Education provided in rejecting CREW's request was that the request 'encompasses a potentially large volume of information on broad topics related to anyone in the Department and anyone at certain outside organizations' and fails to 'identify[] specific individuals or any subjects.'" Id. at 2. CREW pointed out that the May 11 request clearly identified specific topics and records it sought. Id. Finally, CREW stated that just because a request may be broad or designated "burdensome" by an agency does not entitle an agency to state that the records sought are not reasonably described. Id. In conclusion, CREW stated that it was willing to work cooperatively with Education and to the extent the records presented a scope problem or to the extent CREW could narrow its requests to reduce the burden, CREW asked Education to provide information to allow it to do so. Id. at 3.

20. On July 24, 2007, CREW appealed Education's denial of a fee waiver. Letter from Daniel C. Roth, Counsel, CREW, to Chief Information Officer, U.S. Department of Education (July 24, 2007) (attached as Exhibit 4). CREW argued that Education had erroneously required CREW to go beyond the statutory and regulatory standards of a public interest fee waiver. Specifically, Education faulted CREW for failing to "show how 'the subject matter of the requested records [] specifically concern[s] identifiable 'operations or activities of the government.'" (Exhibit 2 at 2). As both FOIA and Education regulations make clear, however, the standard for a public interest fee waiver is that the records sought will contribute significantly to the public's understanding of "the operations or activities of the government." 5 U.S.C. § 552(a)(4)(A)(iii); 34 C.F.R. § 5.64 (a)(1).

21. CREW explained that the subject of its request clearly concerned operations of the federal government in that Susan Landry and the entities associated with her are all involved with the implementation of the Head Start Program, which is an operation of the federal government. Id. at 2. Further, CREW stated that if there is a discussion of the use of the products encompassed in its request then those records concern operations or activities of the government in such a way as to be of interest to the public. Id. at 2-3.

22. By letter dated October 22, 2007, Education denied CREW's request because it failed to reasonably describe the records sought. Letter from Michell Clark, Office of Management, U.S. Department of Education, to Daniel C. Roth, Counsel, CREW (Oct. 22, 2007) (attached as Exhibit 5). Education construed CREW's July 11, 2007 letter asking for Education to clarify its position to be an appeal of Education's June 20, 2007 denial. Id. at 2. Education stated that in response to CREW's July 11, 2007 letter, it had sent CREW a letter dated August 23, 2007 in which it provided CREW with further information. Id. at 3-4. According to Education, CREW never responded to this letter and its appeal was therefore denied. Id. at 3. Additionally, Education denied the fee waiver as moot. Id. at 2.

23. In fact, however, CREW did not receive any correspondence dated August 23, 2007, regarding this request (Education FOIA Request No. 07-00655). CREW did receive correspondence dated August 23, 2007, that referenced an entirely different request (Education FOIA Request No. 07-00661-F) (attached as Exhibit 6) and that contains the language quoted in the October 22, 2007 appeal denial letter in the instant FOIA request (No. 07-00655).

24.  As of the filing of this complaint, Education has not produced any documents to CREW in response to CREW's May 11, 2007 request, or CREW's subsequent July 11 letter.

25.  CREW has now exhausted its administrative remedies with respect to the processing of CREW's FOIA request.  See, e.g., Judicial Watch v. Rossoti, 326 F.3d 1309, 1310 (D.C. Cir. 2003) citing 5 U.S.C. § 552(a)(6)(C).

26.  Education has denied a number of other FOIA requests submitted to it by CREW on the ground that CREW failed to describe the records sought with a reasonable amount of detail such that a Department employee would be able to locate potentially responsive documents with a reasonable amount of effort.  Education also has consistently denied CREW's requests for fee waivers.

27.  Education began taking this approach with CREW's FOIA requests after CREW filed a lawsuit against Education based on the agency's failure to comply with the Federal Advisory Committee Act in its administration of funds to states under the Reading First Program, CREW v. Spellings, et al., Civil No. 06-2086 (HHK) (D.D.C.), and after CREW wrote a letter to Education's Inspector General on May 15, 2007, requesting an investigation into Education's practice of using outside email accounts to conduct official business.  Letter from Melanie Sloan, Executive Director, CREW to John P. Higgins, Jr., Inspector General, U.S. Department of Education (May 15, 2007) (attached as Exhibit 7).

28.  For example, in response to a FOIA request CREW sent to Education on May 16, 2007, seeking documents relating to persons or entities associated with Ignite! Learning, Education responded that the request could not be processed because it did not

"describe the records sought in sufficient detail to enable Department Staff with knowledge of the subject matter of the request to identify and locate responsive documents with a reasonable amount of effort," a response it reiterated when CREW challenged this determination.  Letter from Maria-Teresa Cueva, FOIA Public Liaison, OM/RIMS, U.S. Department of Education, to Daniel C. Roth, CREW (Aug. 23, 2007 (Exhibit 6).  Education also denied CREW's request for a fee waiver for that FOIA request based on the same reasons Education denied CREW's  May 11, 2007 FOIA request.  Letter from Maria-Teresa Cueva, FOIA Public Liaison, OM/RIMS, U.S. Department of Education, to Daniel C. Roth, CREW (June 20, 2007) (attached as Exhibit 8).

29.  Similarly, in response to a March 28, 2007 FOIA request CREW sent to Education for records relating to the Reading First Program, Education repeatedly denied CREW's request for a fee waiver on the ground that CREW had not demonstrated disclosure of the requested records would contribute significantly to public understanding of government operations or activities.  Letter from Michell Clark, Office of Management, U.S. Department of Education, to Daniel C. Roth, (Sept. 6, 2007) (attached as Exhibit 9).

## PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE
**(Failure to Produce Records Under the FOIA)**

30.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

31.  Plaintiff properly asked for records within Education's control.

32.  Plaintiff is entitled by law to access to the records requested under the FOIA, unless defendant makes an explicit and justified statutory exemption claim.

33. Education has produced no records to CREW.

34. Therefore, Education violated FOIA's mandate to release agency records to the public by failing to release the records as plaintiff specifically requested. 5 U.S.C. §§ 552(a)(3)(A), 552(a)(4)(B).

## CLAIM TWO
### (Improper Denial of Fee Waiver)

35. Plaintiff realleges and incorporates by reference all preceding paragraphs.

36. Plaintiff has demonstrated that it is entitled to a waiver of fees associated with processing its FOIA request because disclosure of responsive records will likely contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the plaintiff.

37. Therefore, defendant violated FOIA's and defendant's own regulations when it denied CREW's administrative appeal and upheld defendant's initial determination that CREW is not entitled to a waiver of fees. 5 U.S.C. § 552(a)(4)(A)(iii); 34 C.F.R. § 5.64

## CLAIM THREE
### (Pattern and Practice of Improper Denial of Requests)

38. Plaintiff realleges and incorporates by reference all preceding paragraphs.

39. Defendant has engaged in a pattern and practice of failing to properly respond to CREW's FOIA requests and requests for fee waivers, a pattern and practice that appears to be in response to litigation CREW filed against defendant as well as a complaint CREW filed with Education's inspector general complaining about the conduct of, among others, individuals involved in processing CREW's FOIA requests.

40.  Defendant's pattern and practice of nonresponsiveness is arbitrary, capricious and contrary to the FOIA's requirement that Education release to CREW all non-exempt records sought by CREW's FOIA request, 5 U.S.C. § 552.

41.  Defendant's pattern and practice of refusing to grant CREW a fee waiver is arbitrary, capricious and contrary to the FOIA's fee waiver provisions, 5 U.S.C. § 552(a)(4)(A)(iii), and defendant's regulations, 34 C.F.R. § 5.64.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

(1)  Declare that the U.S. Department of Education has violated the Freedom of Information Act by failing to lawfully satisfy plaintiff's FOIA request of May 16, 2007;

(2)  Order Education to release immediately all records responsive to plaintiff's FOIA request;

(3) Declare that Education violated the Freedom of Information Act and agency regulations when it determined that Plaintiff is not entitled to a waiver of all fees associated with the processing of its FOIA request and declare that Plaintiff is entitled to a fee waiver;

(4) Declare that Education's pattern and practice of nonresponsiveness to CREW's FOIA requests is arbitrary, capricious and contrary to law.

(5) Order Education to cease its standard response to requests from CREW that the requests fail to "describe the records sought with a reasonable amount of detail such that a Department employee would be able to locate potentially responsive documents with a reasonable amount of effort";

(6) Declare Education's pattern and practice of refusing to grant CREW a fee waiver is arbitrary, capricious and contrary to law;

(7) Order Education to cease its standard response of denying CREW's requests for fee waivers based on Education's unfounded claim that disclosure of the requested records will not contribute significantly to public understanding of government operations or activities;

(8) Award plaintiff its reasonable attorney fees and litigation costs in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

(9) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and
   Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (202) 408-5565
Fax: (202) 588-5020

Scott A. Hodes
(D.C. Bar No. 430375)
P.O. Box 42002
Washington, D.C.  20015
Phone (301) 404-0502
Fax (413) 641-2833

Attorneys for Plaintiff

Dated: November 13, 2007

## CIVIL COVER SHEET

JS-44
(Rev. 2/01 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Citizens for Responsibility and Ethics in Washington | U.S. Department of Education |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___11001___
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___11001___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: In land condemnation cases, use the location of the tract of land involved.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Anne L. Weismann
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
202-408-5565

ATTORNEYS (IF KNOWN)

---

**II BASIS OF JURISDICTION**
(SELECT ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
● 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (SELECT ONE FOR PLAINTIFF AND ONE FOR DEFENDANT)
( FOR DIVERSITY CASES ONLY!)

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Select one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**○ E. General Civil (Other)     OR     ○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ G. Habeas Corpus/2255 | ○ H. Employment Discrimination | ⊙ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 USC sec. 552. U.S. Department of Education has failed to produce records in response to plaintiff's FOIA request and to grant plaintiff a fee waiver.

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Select YES only if demanded in complaint    JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction)    ☐ YES ☒ NO    If yes, please complete related case form.

DATE  11/13/07    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

    I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

    III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

    IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

    VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

    VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT 1



**CREW** | citizens for responsibility and ethics in washington

May 11, 2007

By fax, (202) 245-6623, and First Class mail

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

### Re: Freedom of Information Act Request

Dear Sir/Madam:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department") regulations, 34 CFR §§ 5.6 et. seq.

Specifically, CREW seeks records of any and all communications from January 20, 2001, to the present, between officials at the Department of Education and those at the (1) Executive Office of the President, (2) White House Office and (3) Office of the First Lady, regarding any and all of the following:

(A) Susan Landry or Susan Landry Moore;
(B) University of Texas Health Science Center at Houston's Children's Learning Institute;
(C) University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
(D) Texas State Center for Childhood Development (SCECD);
(E) Texas Early Education Model (TEEM); and/or
(F) Wireless Generation's mCLASS:CIRCLE software.

In addition, CREW requests any and all communications from January 20, 2001, to the present, between officials at the Department of Education and:

(A) Susan Landry or Susan Landry Moore;
(B) Officials or employees at the University of Texas Health Science Center at Houston's Children's Learning Institute (CLI);
(C) Officials or employees at the University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education

(CIRCLE);
D) Officials or employees at the Texas State Center for Childhood Development
(SCECD); and/or
E) Officials or employees at Wireless Generation.

Please search responsive records regardless of format, medium or physical characteristics.
Where possible, please produce records electronically in PDF or TIF format on a CD-ROM. We
seek records of any kind, including electronic records, audiotapes, videotapes and photographs.
Our request includes any telephone messages, voice mail messages, daily agenda and calendars,
information about scheduled meetings and/or discussions, whether in-person or over the
telephone, agendas for those meetings and/or discussions, participants included in those meetings
and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at
those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or
facsimiles sent as a result of those meetings and/or discussions and transcripts or notes of any
such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure,
CREW requests that you provide an index of those documents as required under Vaughn v.
Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a
Vaughn index must describe each document claimed as exempt with sufficient specificity "to
permit a reasoned judgment as to whether the material is actually exempt under FOIA."
Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the
Vaughn index must "describe each document or portion thereof withheld, and for **each**
withholding it must discuss the consequences of supplying the sought-after information." King
v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the
withholding agency must supply 'a relatively detailed justification, specifically identifying the
reasons why a particular exemption is relevant and correlating those claims with the particular
part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S.
Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from
disclosure, please disclose any reasonably segregable non-exempt portions of the requested
records. See 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt
segments, but that those non-exempt segments are so dispersed throughout the document as to
make segregation impossible, please state what portion of the document is non-exempt, and how
the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims
of nonsegregability must be made with the same degree of detail as required for claims of
exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is
not reasonable to segregate portions of the record for release.

2

## Fee Waiver Request

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government programs and procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987).

Specifically, these records are likely to contribute to the public's understanding of the influence and impact on education policy throughout the United States of Dr. Susan Landry and the corporations and federally-funded research centers with which she is affiliated. For example, as The New York Times reported in 2006, Dr. Landry served on the multi-agency National Early Literacy Panel and has designed widely-used commercial assessment products for early reading students. John O'Neil, Early Repairs in Foundation for Reading, New York Times, Oct. 4, 2006 (attached as Exhibit A). As that article points out, the assessment tools designed by Dr. Landry and others at the University of Texas Center for Improving the Readiness of Children for Learning and Education (CIRCLE) are being widely used in schools as part of the federally-funded Head Start program (Id.), which taxpayers support with nearly $7 billion annually. See http://www.acf.hhs.gov/programs/hsb/research/2007.htm. According to manufacturer Wireless Generation, 45,000 preschool students were tested on the "M-Class:Circle" assessment using the company's hand-held devices in 2005. O'Neil, New York Times, Oct. 4, 2006.

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfies the criteria for a fee waiver.

3

**Conclusion**

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Enclosure

4

**EXHIBIT A**

Early Repairs in Foundation for Reading - New York Times          http://www.nytimes.com/2006/10/04/nyregion/04READING.html?e...

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY 

October 4, 2006

# Early Repairs in Foundation for Reading

### By JOHN O'NEIL

ALLENTOWN, Pa. — Children with severe reading problems usually struggle for years before getting the help they need. But a growing number of neurologists and educators say that with the latest diagnostic tests, children at high risk for these problems can be identified in preschool and treated before they ever begin to read.

The newer tests, available in computerized versions, measure a child's fluency with the skills that are the foundation of reading: the ability to recognize differences between sounds, the knowledge of letters and the accumulation of basic vocabulary and language skills. The National Early Literacy Panel, a committee of experts convened by a consortium of federal agencies, has found that these tests, when given to 3- and 4-year-olds, predict later reading problems as effectively as they do when they are given to kindergartners and first graders, said the panel's chairman, Dr. Timothy Shanahan of the University of Illinois in Chicago. The committee plans to recommend increased preschool screening when it publishes its findings later this year.

The panel also will recommend some shifts in teaching techniques, said a panel member, Dr. Susan Landry of the University of Texas Medical School at Houston. These include having at-risk children spend more time in small groups that address their specific weaknesses; emphasizing skills like blending sounds (C + AT = CAT), which have been found to be good performance predictors; and training parents to reinforce school lessons.

The point is to identify and attack the problems early, when they are easiest to correct.

"Once a child falls behind, it's very difficult to catch up," said Dr. Angela Fawcett of the University of Sheffield in England.

In the Head Start program here, screening and teaching are increasingly tied together, and a detailed skills assessment is part of the new school year routine. Last month, Karen Gischlar, a reading consultant, sat down with a 4-year-old, Destiny Freer, with a set of blocks, a book of pictures and a handheld computer loaded with M-Class: Circle, one of several formal screening tests on the market.

M-Class: Circle, which was developed by Dr. Landry, measures the skills linked to reading success. Its manufacturer, Wireless Generation, said the test was used to screen 45,000 preschoolers last year; paper versions were used to screen a similar number.

Destiny breezed through the first rounds of a series of one-minute tests, on naming letters and simple objects. She also aced the first rhyming exercise, on whether pairs of words sounded the "same or different."

But her answers became hesitant on the next round, when she was asked to find a rhyme to a word given by Ms. Gischlar. And she had more trouble with higher-level skills, like using the blocks to show the number of

words in a short sentence and clapping out the syllables in words like cowboy, big or wagon.

When the test was done, there on the computer screen were Destiny's scores, color coded in red, green and yellow, and a comparison to her scores from earlier this year, both of which showed Destiny to be developmentally on track, despite some of her faltering.

Another tap of Ms. Gischlar's stylus brought up a list of suggestions for her specific weaknesses — building awareness of word sounds, for instance, by telling a story in rhyme and letting her guess how some sentences end.

Destiny's teacher, Eliza Commareri, said the test helped plan how to individualize instruction and in arranging small groups because the program provides a database showing children with similar needs. The other benefit, she said, was the close link between the screening and a step-by-step curriculum of suggested activities. For teaching syllables, for instance, Ms. Commareri said she might ask the whole class to clap out "play-ground" when they're headed out to recess, or get a few children together to bang out words on a drum.

"It's very helpful because it gives results in all different areas, and activities in all different areas," she said.

Head Start programs have been taking the lead in preschool screening, in large part because low-income children have high rates of language delay; most of the children in the center here arrive more than a year behind.

Reading failure is linked to two different causes. Children with dyslexia tend to have inherited abnormalities in the brain's sound-processing mechanism. But insufficient early exposure to what neurologists call "rich language," a situation more common in poor families, can also undermine the processing abilities that are reading's foundation.

Screening can uncover both kinds of problems, but poor children are the ones who can benefit the most from preschool intervention, said Dr. Peggy McCardle, the chief of the child development branch of the National Institute of Child Health and Human Development.

School policy has traditionally been that children qualify for significant extra help only after they've fallen behind. In 2004, according to federal data, fewer than 10 percent of students getting special education services under the category of specific learning disability — most of whom have reading as their primary problem — were younger than 9.

In August, Education Secretary Margaret Spellings announced new regulations meant to make it easier for elementary schools to offer extra help as soon as students start to struggle.

Dr. Fawcett, who is also the editor of the journal Dyslexia, said making students wait for help was costly, both for schools and students.

A study she led found that a small amount of extra tutoring given to preschoolers with language delays — an hour a week of small-group work for 10 weeks — boosted their skills in comparison with similar children in a control group. The gain exceeded what a year's worth of remediation at age 7 or 8 would produce, she said.

Marj Jones, who runs Head Start programs in Phoenix as the executive director of the Arizona Literacy and Learning Center, is an enthusiastic user of another screening test, Get Ready to Read, developed by the

National Center for Learning Disabilities. The center's executive director, James H. Wendorf, estimated that the test was used to screen about 70,000 preschoolers each year by teachers or by parents using the interactive version available at getreadytoread.org. But Ms. Jones said that even the best testing produces only a limited gain unless it is part of a larger effort.

"You can go in and screen a child, but if you don't have continuous support from teachers and parents, you've only accomplished a short-term goal," she said.

Copyright 2006 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

# EXHIBIT 2



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF MANAGEMENT

June 20, 2007

Mr. Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00655-F

Dear Mr. Roth:

This letter is in response to your fax dated May 11, 2007 requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Your request was received in this office on May 15, 2007. You asked for the following information.

1.  All communications from January 20, 2001, to the present, between officials at the Department of Education and those at the (1) Executive Office of the President, (2) White House Office and (3) Office of the First Lady, regarding any and all of the following:
    a.  Susan Landry or Susan Landry Moore;
    b.  University of Texas Health Science Center at Houston's Children's Learning Institute;
    c.  University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
    d.  Texas State Center for Childhood Development (SCECD);
    e.  Texas Early Education Model (TEEM); and/or
    f.  Wireless Generation's mCLASS: CIRCLE software.

2.  All communications from January 20, 2001, to the present, between officials at the Department of Education and:
    a.  Susan Landry or Susan Landry Moore;
    b.  Officials or employees at the University of Texas Health Science Center at Houston's Children's Learning Institute (CLI);
    c.  Officials or employees at the University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
    d.  Officials or employees at the Texas State Center for Childhood Development (SCECD); and/or
    e.  Officials or employees at Wireless Generation.

We are unable to process your request at this time. As you are aware, FOIA requests must reasonably describe the records that are sought in order for Department employees, with knowledge of the subject matter, to identify and locate potentially responsive documents. 5 U.S.C. § 552(a)(3)(A) (2000). Your request seeks access to "any and all communications" between Department officials and officials at "(1) Executive Office of the President, (2) White

Page 2 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00655-F

House Office and (3) Office of the First Lady" as well as the communications of Department officials with Susan Landry and certain entities. The scope of your request encompasses a potentially large volume of information on broad topics related to anyone in the Department and anyone at certain outside organizations, without identifying specific individuals or any subject(s). These facts are especially critical to items 2b through 2e of your request. The Department has concluded that your request as stated does not describe the records sought with a reasonable amount of detail such that a Department employee would be able to locate potentially responsive documents with a reasonable amount of effort. See Dale v. Internal Revenue Service, 238 F.Supp.2d 99 (D. D.C. 2002). Consequently, the Department is unable to process your request as it is currently stated.

**Fee Waiver**
In addition, you have requested a fee waiver for your request. The requester bears the burden of justifying entitlement to a fee waiver. See Casad v. Department of Health & Human Services, 2003 U.S. Dist. LEXIS 13007 (D. D.C. June 20, 2003). To meet this burden, a requester must satisfy two statutory requirements before the Department may waive or reduce properly assessed fees: (1) disclosure of the information must be in the public interest because the information primarily benefits the general public and is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) disclosure of the information must not be primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii)(2000); see also 34 C.F.R. § 5.64(a). Moreover, a requester must address both factors in sufficient detail in order for an agency to determine whether it can reduce or waive the fees. Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003).

In order to determine whether the disclosure of the information responsive to the request furthers the narrow public interest cognizable under the FOIA, the Department must consider the following four (4) factors in sequence:

1. The subject matter of the requested records themselves must specifically concern identifiable "operations or activities of the government";
2. In order for the disclosure to be "likely to contribute" to an understanding of specific government operations or activities, the disclosable portions of the requested information must be meaningfully informative in relation to the subject matter of the request;
3. The disclosure must contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons; and
4. The disclosure must "contribute significantly" to public understanding of government operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7, 2004); see also 34 C.F.R. § 5.64(b)(1) and (2). Only if all four elements have been met will the Department conclude that a requester has satisfied the first prong of the public interest element of the statutory requirement for a fee waiver.

Where the Department concludes that the public interest requirement has been met, it may waive or reduce applicable fees only where it also finds that "disclosure of the information . . . is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii)(2000). In

Page 3 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00655-F

order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

1. Does the request involve any "commercial interest of the requester" (if not, the requester satisfies the second prong of the statutory fee waiver test); and
2. If so, the agency must balance the requester's commercial interest against the identified public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee waiver or reduction may be granted only where the public interest in disclosure is greater in magnitude than the requester's commercial interest.

See also 34 C.F.R. § 5.64(b)(3).

For your information, the Department does not customarily grant blanket waivers, but rather considers each waiver request on a case-by-case basis.

The Department has reviewed your request and denies the request because it fails to satisfy the first factor of the public interest analysis. As stated above, the first factor of the public interest analysis requires that the subject matter of the requested records specifically concern an identifiable operation or activity of the government. In order to satisfy this element, the requester must identify a nexus between the requested records and the benefit to the public. See Nat'l Treasury Employees Union v. Griffin, 811 F.2d 644 (D.C. Cir. 1987). Moreover, the requester must satisfy this burden with a level of specificity, beyond generalized statements that the request somehow relates to a government operation or activity. Judicial Watch v. U.S. Dep't of Justice, 122 F.Supp.2d 5, 9 (D. D.C. 2000); see Larson v. C.I.A., 843 F.2d 1481, 1483 (D.C. Cir. 1988).

In your request you state that "these records are likely to contribute to the public's understanding of the influence and impact on education policy throughout the United States of Dr. Susan Landry and the corporations and federally-funded research centers with which she is affiliated." You also state that an assessment tools designed by Dr. Landry "are being widely used in schools as a part of the federally-funded Head Start program[.]" As stated above, the Department has concluded that your request does not reasonably describe the records sought. You have referred to assessment tools designed by Dr. Landry that are used by schools as part of the Head Start program. You also refer to Dr. Landry's (and her affiliates) influence and impact on educational policy. However, you have not stated how the records sought relate to a specific government activity or program. And while your refer to the Head Start program, your reference is in the context of the products that a school might use under the particular program. However, the used of such products does not shed light on an operation or activity of the government.

In sum, the Department denies your request for a fee waiver in the present case. Since you have failed to meet your burden regarding a fundamental threshold requirement of the legal standard for analyzing fee waiver requests under the FOIA, the Department cannot address the remaining factors of the fee waiver analysis. However, the Department may reconsider this decision should you choose to submit supplemental or clarifying information.

Fees are charged for searching/reviewing and duplication for responsive records. The fee is calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The search and the review fee are calculated based on the hourly rate of pay, plus 16% administrative charge and the duplication costs are ten cents per photocopied page. Our regulations, 34 CFR § 5.61 require us

Page 4 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00655-F

to allow you to modify your request if the cost is more than $25.00.  In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is to be greater than $250.00, the requester <u>must pay</u> in advance.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter.  Your appeal should be received by the FOIA office on or before July 25, 2007.  Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

<b><u>Appeal Address:</u></b>

> U.S. Department of Education
> Chief Information Officer
> 400 Maryland Avenue, SW, FOB-6-2W311
> ATTN:  FOIA Appeals
> Washington, DC  20202-4500

Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request.  Please send your clarification letter to the U.S. Department of Education, ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC  20202-4700, or send it by e-mail: EDFOIAManager@ed.gov.

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

> Sincerely,
>
> Maria-Teresa Cueva
> FOIA Public Liaison, OM/RIMS

# EXHIBIT 3

# CREW | citizens for responsibility and ethics in washington

July 11, 2007

Ms. Maria-Teresa Cueva
U.S. Department of Education
ATTN: FOIA Office
400 Maryland Avenue, S.W.
PCP 9th Floor
Washington, D.C. 20202-4700

**By electronic and first class mail**

**Re: FOIA Request No. 07-00655-F**

Dear Ms. Cueva:

On May 11, 2007, Citizens for Responsibility and Ethics in Washington ("CREW") sent a Freedom of Information Act ("FOIA") request to the Department of Education ("Education") seeking records of contacts regarding Dr. Susan Landry and various programs and entities with which Dr. Landry is affiliated (attached as Exhibit A). Specifically, CREW requested records of all Education communications from January 20, 2001, to the present, with officials in the (1) Executive Office of the President, (2) White House Office and (3) Office of the First Lady, regarding any and all of the following:

(A) Susan Landry or Susan Landry Moore;
(B) University of Texas Health Science Center at Houston's Children's Learning Institute;
(C) University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
(D) Texas State Center for Childhood Development (SCECD);
(E) Texas Early Education Model (TEEM); and/or
(F) Wireless Generation's mCLASS:CIRCLE software.

Id. CREW also requested all Education communications with Dr. Landry and officials or employees of entities B, C, D and F. Id.

By letter dated June 20, 2007, you responded that Education is unable to process CREW's request as currently drafted because it does not "describe the records sought with a reasonable amount of detail such that a Department employee would be able to locate potentially responsive documents with a reasonable amount of effort." Letter from Maria-Teresa Cueva, U.S. Department of Education, to Daniel C. Roth, CREW (June 20, 2007) (citation omitted)

(attached as Exhibit B). You provided CREW with an opportunity to clarify its request.[1] CREW now responds to Education's contention that CREW's May 16, 2007 FOIA request does not reasonably describe the records we seek.

The only explanation Education provided in rejecting CREW's request was unsubstantiated contentions that CREW's request "encompasses a potentially large volume of information on broad topics related to anyone in the Department and anyone at certain outside organizations" and fails to "identify[] specific individuals or any subjects." As explained below, there is no legitimate basis for Education's refusal to process CREW's request as submitted.

Item 1 of CREW's request, quoted above in full, requests all Education communications with three White House offices on six specific topics identified in items A-F. The subjects in Item 1 are Dr. Landry and the clearly-identified entities and programs: the UT Health Science Center, CIRCLE, SCECD, TEEM, and Wireless Generation. Thus, Education's statements that CREW's request is unreasonably broad and fails to "identify[] . . . any subjects" is simply wrong.

Similarly, Item 2 clearly identifies the records CREW seeks: all Education communications with Dr. Landry and officials or employees of entities B-E.[2] See Exhibit A. Education correctly notes that Item 2 does not specify a particular subject. That fact, however, does not render CREW's request unreasonably broad. The law of this Circuit is clear: "The linchpin inquiry is whether the agency is able to determine 'precisely what records (are) being requested.'" Yeager v. Drug Enforcement Admin., 678 F.2d 315, 322, 326 (D.C. Cir. 1982). Here, there is no ambiguity about precisely which records CREW seeks.

Education also rejected CREW's FOIA request on the ground that it "encompasses a potentially large volume of information" and is "related to anyone in the Department." These arguments reduce to Education claiming that this request is burdensome, not that it fails to reasonably describe the records sought. The fact that this request may produce a large volume of records (which Education suggests without appearing to have done any investigation) does not absolve Education of the obligation to begin processing the request. As the Department of Justice clearly states in its 2007 FOIA Guide, "the fact that a FOIA request is very broad or 'burdensome' in its magnitude does not, in and of itself, entitle an agency to deny that request on the basis that it does not 'reasonably describe' the records sought." U.S. Dep't of Justice, Freedom of Information Act Guide, March 2007 at 74 (citation omitted).

---

[1] Your June 20, 2007 letter also addressed CREW's request for a fee waiver. CREW is separately appealing Education's initial determination to deny CREW a fee waiver.

[2] Because these entities are either associated with state institutions or private industry, any individuals associated with those entities would have uniquely identifiable email addresses, which should at least provide a starting point for any search.

CREW is always willing to work cooperatively with agencies to narrow requests while ensuring that our rights under FOIA are fully realized. Here, CREW can not be expected to narrow its request in a vacuum without Education's input regarding the existence and likely location of the records CREW seeks. To the extent searching for those records presents a scope problem, or to the extent CREW could narrow its request to reduce the burden on Education without abandoning any rights to documents under FOIA, please provide information other than the conclusion that CREW's request as submitted "encompasses a potentially large volume of information."

Taking these issues into account, please clarify and explain the reasons the Department cannot process CREW's request of May 16, 2007. I will be happy to answer any questions, and can be reached at (202) 408-5565, or droth@citizensforethics.org.

Sincerely,

Daniel C. Roth
Citizens for Responsibility and
  Ethics in Washington
1400 Eye Street, N.W.
Suite 450
Washington, D.C. 20005

# EXHIBIT A



May 11, 2007

By fax, (202) 245-6623, and First Class mail

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department") regulations, 34 CFR §§ 5.6 et. seq.

Specifically, CREW seeks records of any and all communications from January 20, 2001, to the present, between officials at the Department of Education and those at the (1) Executive Office of the President, (2) White House Office and (3) Office of the First Lady, regarding any and all of the following:

(A) Susan Landry or Susan Landry Moore;
(B) University of Texas Health Science Center at Houston's Children's Learning Institute;
(C) University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
(D) Texas State Center for Childhood Development (SCECD);
(E) Texas Early Education Model (TEEM); and/or
(F) Wireless Generation's mCLASS:CIRCLE software.

In addition, CREW requests any and all communications from January 20, 2001, to the present, between officials at the Department of Education and:

(A) Susan Landry or Susan Landry Moore;
(B) Officials or employees at the University of Texas Health Science Center at Houston's Children's Learning Institute (CLI);
(C) Officials or employees at the University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education

(CIRCLE);
D) Officials or employees at the Texas State Center for Childhood Development
(SCECD); and/or
E) Officials or employees at Wireless Generation.

Please search responsive records regardless of format, medium or physical characteristics.
Where possible, please produce records electronically in PDF or TIF format on a CD-ROM. We
seek records of any kind, including electronic records, audiotapes, videotapes and photographs.
Our request includes any telephone messages, voice mail messages, daily agenda and calendars,
information about scheduled meetings and/or discussions, whether in-person or over the
telephone, agendas for those meetings and/or discussions, participants included in those meetings
and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at
those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or
facsimiles sent as a result of those meetings and/or discussions and transcripts or notes of any
such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure,
CREW requests that you provide an index of those documents as required under Vaughn v.
Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a
Vaughn index must describe each document claimed as exempt with sufficient specificity "to
permit a reasoned judgment as to whether the material is actually exempt under FOIA."
Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the
Vaughn index must "describe each document or portion thereof withheld, and for **each**
withholding it must discuss the consequences of supplying the sought-after information." King
v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the
withholding agency must supply 'a relatively detailed justification, specifically identifying the
reasons why a particular exemption is relevant and correlating those claims with the particular
part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S.
Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from
disclosure, please disclose any reasonably segregable non-exempt portions of the requested
records. See 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt
segments, but that those non-exempt segments are so dispersed throughout the document as to
make segregation impossible, please state what portion of the document is non-exempt, and how
the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims
of nonsegregability must be made with the same degree of detail as required for claims of
exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is
not reasonable to segregate portions of the record for release.

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government programs and procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987).

Specifically, these records are likely to contribute to the public's understanding of the influence and impact on education policy throughout the United States of Dr. Susan Landry and the corporations and federally-funded research centers with which she is affiliated. For example, as *The New York Times* reported in 2006, Dr. Landry served on the multi-agency National Early Literacy Panel and has designed widely-used commercial assessment products for early reading students. John O'Neil, Early Repairs in Foundation for Reading, New York Times, Oct. 4, 2006 (attached as Exhibit A). As that article points out, the assessment tools designed by Dr. Landry and others at the University of Texas Center for Improving the Readiness of Children for Learning and Education (CIRCLE) are being widely used in schools as part of the federally-funded Head Start program (Id.), which taxpayers support with nearly $7 billion annually. See http://www.acf.hhs.gov/programs/hsb/research/2007.htm. According to manufacturer Wireless Generation, 45,000 preschool students were tested on the "M-Class:Circle" assessment using the company's hand-held devices in 2005. O'Neil, New York Times, Oct. 4, 2006.

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfies the criteria for a fee waiver.

3

**Conclusion**

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Enclosure

# EXHIBIT A

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY *Wacid*

October 4, 2006

# Early Repairs in Foundation for Reading

### By JOHN O'NEIL

ALLENTOWN, Pa. — Children with severe reading problems usually struggle for years before getting the help they need. But a growing number of neurologists and educators say that with the latest diagnostic tests, children at high risk for these problems can be identified in preschool and treated before they ever begin to read.

The newer tests, available in computerized versions, measure a child's fluency with the skills that are the foundation of reading: the ability to recognize differences between sounds, the knowledge of letters and the accumulation of basic vocabulary and language skills. The National Early Literacy Panel, a committee of experts convened by a consortium of federal agencies, has found that these tests, when given to 3- and 4-year-olds, predict later reading problems as effectively as they do when they are given to kindergartners and first graders, said the panel's chairman, Dr. Timothy Shanahan of the University of Illinois in Chicago. The committee plans to recommend increased preschool screening when it publishes its findings later this year.

The panel also will recommend some shifts in teaching techniques, said a panel member, Dr. Susan Landry of the University of Texas Medical School at Houston. These include having at-risk children spend more time in small groups that address their specific weaknesses; emphasizing skills like blending sounds (C + AT = CAT), which have been found to be good performance predictors; and training parents to reinforce school lessons.

The point is to identify and attack the problems early, when they are easiest to correct.

"Once a child falls behind, it's very difficult to catch up," said Dr. Angela Fawcett of the University of Sheffield in England.

In the Head Start program here, screening and teaching are increasingly tied together, and a detailed skills assessment is part of the new school year routine. Last month, Karen Gischlar, a reading consultant, sat down with a 4-year-old, Destiny Freer, with a set of blocks, a book of pictures and a handheld computer loaded with M-Class: Circle, one of several formal screening tests on the market.

M-Class: Circle, which was developed by Dr. Landry, measures the skills linked to reading success. Its manufacturer, Wireless Generation, said the test was used to screen 45,000 preschoolers last year; paper versions were used to screen a similar number.

Destiny breezed through the first rounds of a series of one-minute tests, on naming letters and simple objects. She also aced the first rhyming exercise, on whether pairs of words sounded the "same or different."

But her answers became hesitant on the next round, when she was asked to find a rhyme to a word given by Ms. Gischlar. And she had more trouble with higher-level skills, like using the blocks to show the number of

words in a short sentence and clapping out the syllables in words like cowboy, big or wagon.

When the test was done, there on the computer screen were Destiny's scores, color coded in red, green and yellow, and a comparison to her scores from earlier this year, both of which showed Destiny to be developmentally on track, despite some of her faltering.

Another tap of Ms. Gischlar's stylus brought up a list of suggestions for her specific weaknesses — building awareness of word sounds, for instance, by telling a story in rhyme and letting her guess how some sentences end.

Destiny's teacher, Eliza Commareri, said the test helped plan how to individualize instruction and in arranging small groups because the program provides a database showing children with similar needs. The other benefit, she said, was the close link between the screening and a step-by-step curriculum of suggested activities. For teaching syllables, for instance, Ms. Commareri said she might ask the whole class to clap out "play-ground" when they're headed out to recess, or get a few children together to bang out words on a drum.

"It's very helpful because it gives results in all different areas, and activities in all different areas," she said.

Head Start programs have been taking the lead in preschool screening, in large part because low-income children have high rates of language delay; most of the children in the center here arrive more than a year behind.

Reading failure is linked to two different causes. Children with dyslexia tend to have inherited abnormalities in the brain's sound-processing mechanism. But insufficient early exposure to what neurologists call "rich language," a situation more common in poor families, can also undermine the processing abilities that are reading's foundation.

Screening can uncover both kinds of problems, but poor children are the ones who can benefit the most from preschool intervention, said Dr. Peggy McCardle, the chief of the child development branch of the National Institute of Child Health and Human Development.

School policy has traditionally been that children qualify for significant extra help only after they've fallen behind. In 2004, according to federal data, fewer than 10 percent of students getting special education services under the category of specific learning disability — most of whom have reading as their primary problem — were younger than 9.

In August, Education Secretary Margaret Spellings announced new regulations meant to make it easier for elementary schools to offer extra help as soon as students start to struggle.

Dr. Fawcett, who is also the editor of the journal Dyslexia, said making students wait for help was costly, both for schools and students.

A study she led found that a small amount of extra tutoring given to preschoolers with language delays — an hour a week of small-group work for 10 weeks — boosted their skills in comparison with similar children in a control group. The gain exceeded what a year's worth of remediation at age 7 or 8 would produce, she said.

Marj Jones, who runs Head Start programs in Phoenix as the executive director of the Arizona Literacy and Learning Center, is an enthusiastic user of another screening test, Get Ready to Read, developed by the

National Center for Learning Disabilities. The center's executive director, James H. Wendorf, estimated that the test was used to screen about 70,000 preschoolers each year by teachers or by parents using the interactive version available at getreadytoread.org. But Ms. Jones said that even the best testing produces only a limited gain unless it is part of a larger effort.

"You can go in and screen a child, but if you don't have continuous support from teachers and parents, you've only accomplished a short-term goal," she said.

Copyright 2006 The New York Times Company

**EXHIBIT B**



# UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

June 20, 2007

Mr. Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00655-F

Dear Mr. Roth:

This letter is in response to your fax dated May 11, 2007 requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Your request was received in this office on May 15, 2007. You asked for the following information:

1. All communications from January 20, 2001, to the present, between officials at the Department of Education and those at the (1) Executive Office of the President, (2) White House Office and (3) Office of the First Lady, regarding any and all of the following:
    a. Susan Landry or Susan Landry Moore;
    b. University of Texas Health Science Center at Houston's Children's Learning Institute;
    c. University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
    d. Texas State Center for Childhood Development (SCECD);
    e. Texas Early Education Model (TEEM); and/or
    f. Wireless Generation's mCLASS: CIRCLE software.

2. All communications from January 20, 2001, to the present, between officials at the Department of Education and:
    a. Susan Landry or Susan Landry Moore;
    b. Officials or employees at the University of Texas Health Science Center at Houston's Children's Learning Institute (CLI);
    c. Officials or employees at the University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
    d. Officials or employees at the Texas State Center for Childhood Development (SCECD); and/or
    e. Officials or employees at Wireless Generation.

We are unable to process your request at this time. As you are aware, FOIA requests must reasonably describe the records that are sought in order for Department employees, with knowledge of the subject matter, to identify and locate potentially responsive documents. 5 U.S.C. § 552(a)(3)(A) (2000). Your request seeks access to "any and all communications" between Department officials and officials at "(1) Executive Office of the President, (2) White

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

Page 2 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00655-F

House Office and (3) Office of the First Lady" as well as the communications of Department officials
with Susan Landry and certain entities. The scope of your request encompasses a potentially large
volume of information on broad topics related to anyone in the Department and anyone at certain outside
organizations, without identifying specific individuals or any subject(s). These facts are especially
critical to items 2b through 2e of your request. The Department has concluded that your request as stated
does not describe the records sought with a reasonable amount of detail such that a Department employee
would be able to locate potentially responsive documents with a reasonable amount of effort. See Dale v.
Internal Revenue Service, 238 F.Supp.2d 99 (D. D.C. 2002). Consequently, the Department is unable to
process your request as it is currently stated.

**Fee Waiver**
In addition, you have requested a fee waiver for your request. The requester bears the burden of
justifying entitlement to a fee waiver. See Casad v. Department of Health & Human Services, 2003 U.S.
Dist. LEXIS 13007 (D. D.C. June 20, 2003). To meet this burden, a requester must satisfy two statutory
requirements before the Department may waive or reduce properly assessed fees: (1) disclosure of the
information must be in the public interest because the information primarily benefits the general public
and is likely to contribute significantly to public understanding of the operations or activities of the
government; and (2) disclosure of the information must not be primarily in the commercial interest of the
requester. 5 U.S.C. § 552(a)(4)(A)(iii)(2000); see also 34 C.F.R. § 5.64(a). Moreover, a requester must
address both factors in sufficient detail in order for an agency to determine whether it can reduce or waive
the fees. Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003).

In order to determine whether the disclosure of the information responsive to the request furthers the
narrow public interest cognizable under the FOIA, the Department must consider the following four (4)
factors in sequence:

1. The subject matter of the requested records themselves must specifically concern identifiable
   "operations or activities of the government";
2. In order for the disclosure to be "likely to contribute" to an understanding of specific
   government operations or activities, the disclosable portions of the requested information
   must be meaningfully informative in relation to the subject matter of the request;
3. The disclosure must contribute to the "understanding of the public at large," as opposed to
   that of the individual requester or a narrow segment of interested persons; and
4. The disclosure must "contribute significantly" to public understanding of government
   operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7,
2004); see also 34 C.F.R. § 5.64(b)(1) and (2). Only if all four elements have been met will the
Department conclude that a requester has satisfied the first prong of the public interest element of the
statutory requirement for a fee waiver.

Where the Department concludes that the public interest requirement has been met, it may waive or
reduce applicable fees only where it also finds that "disclosure of the information . . . is not primarily in
the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii)(2000). In

order to determine whether this second requirement has been satisfied, the Department must consider the
following two factors in sequence:

1. Does the request involve any "commercial interest of the requester" (if not, the requester
   satisfies the second prong of the statutory fee waiver test); and
2. If so, the agency must balance the requester's commercial interest against the identified
   public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a
   fee waiver or reduction may be granted only where the public interest in disclosure is greater
   in magnitude than the requester's commercial interest.

See also 34 C.F.R. § 5.64(b)(3).

For your information, the Department does not customarily grant blanket waivers, but rather considers
each waiver request on a case-by-case basis.

The Department has reviewed your request and denies the request because it fails to satisfy the first factor
of the public interest analysis. As stated above, the first factor of the public interest analysis requires that
the subject matter of the requested records specifically concern an identifiable operation or activity of the
government. In order to satisfy this element, the requester must identify a nexus between the requested
records and the benefit to the public. See Nat'l Treasury Employees Union v. Griffin, 811 F.2d 644 (D.C.
Cir. 1987). Moreover, the requester must satisfy this burden with a level of specificity, beyond
generalized statements that the request somehow relates to a government operation or activity. Judicial
Watch v. U.S. Dep't of Justice, 122 F.Supp.2d 5, 9 (D. D.C. 2000); see Larson v. C.I.A., 843 F.2d, 1481,
1483 (D.C. Cir. 1988).

In your request you state that "these records are likely to contribute to the public's understanding of the
influence and impact on education policy throughout the United States of Dr. Susan Landry and the
corporations and federally-funded research centers with which she is affiliated." You also state that an
assessment tools designed by Dr. Landry "are being widely used in schools as a part of the federally-
funded Head Start program[.]"   As stated above, the Department has concluded that your request does
not reasonably describe the records sought. You have referred to assessment tools designed by Dr.
Landry that are used by schools as part of the Head Start program. You also refer to Dr. Landry's (and
her affiliates) influence and impact on educational policy. However, you have not stated how the records
sought relate to a specific government activity or program. And while your refer to the Head Start
program, your reference is in the context of the products that a school might use under the particular
program. However, the used of such products does not shed light on an operation or activity of the
government.

In sum, the Department denies your request for a fee waiver in the present case. Since you have failed to
meet your burden regarding a fundamental threshold requirement of the legal standard for analyzing fee
waiver requests under the FOIA, the Department cannot address the remaining factors of the fee waiver
analysis. However, the Department may reconsider this decision should you choose to submit
supplemental or clarifying information.

Fees are charged for searching/reviewing and duplication for responsive records. The fee is calculated in
accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The
search and the review fee are calculated based on the hourly rate of pay, plus 16% administrative charge
and the duplication costs are ten cents per photocopied page. Our regulations, 34 CFR § 5.61 require us

Page 4 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00655-F

to allow you to modify your request if the cost is more than $25.00. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is to be greater than $250.00, the requester must pay in advance.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Your appeal should be received by the FOIA office on or before July 25, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

**Appeal Address:**

U.S. Department of Education
Chief Information Officer
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: FOIA Appeals
Washington, DC 20202-4500

Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request. Please send your clarification letter to the U.S. Department of Education, ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC 20202-4700, or send it by e-mail: EDFOIAManager@ed.gov.

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

# EXHIBIT 4

# CREW | citizens for responsibility and ethics in washington

July 24, 2007

U.S. Department of Education
Chief Information Officer
400 Maryland Avenue, S.W.
FOB-6-2W311
ATTN: FOIA Appeals
Washington, D.C. 20202-4500

**By fax (202) 245-6623 and first class and electronic mail**

**Re: FOIA Request No. 07-00661-F**

Dear Sir/Madam:

On May 11, 2007, Citizens for Responsibility and Ethics in Washington ("CREW") sent a Freedom of Information Act ("FOIA") request to the Department of Education ("Education") seeking records of communications with and regarding Dr. Susan Landry and various programs and entities with which Dr. Landry is affiliated (attached as Exhibit A). Specifically, CREW requested records of all Education communications from January 20, 2001, to the present, with officials in the (1) Executive Office of the President, (2) White House Office and (3) Office of the First Lady, regarding any and all of the following:

(A) Susan Landry or Susan Landry Moore;
(B) University of Texas Health Science Center at Houston's Children's Learning Institute;
(C) University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
(D) Texas State Center for Childhood Development (SCECD);
(E) Texas Early Education Model (TEEM); and/or
(F) Wireless Generation's mCLASS:CIRCLE software.

Id. CREW also requested all Education communications with Dr. Landry and officials or employees of entities B, C, D and F. Id. CREW requested a waiver of fees associated with the processing of its request based, *inter alia*, on the public interest in the "influence and impact on education policy throughout the United States of Dr. Susan Landry and the corporations and federally-funded research centers with which she is affiliated." Id. at 3.

By letter dated June 20, 2007, Education denied CREW's request for a fee waiver.[1] Letter from Maria-Teresa Cueva, U.S. Department of Education, to Daniel C. Roth, CREW (June 20, 2007) (attached as Exhibit B). CREW hereby appeals the denial of its fee waiver request and respectfully requests that you reverse it for the reasons set forth below.

## **Background**

Among other positions she holds, Dr. Susan Landry is the Director of the Center for Improving the Readiness of Children for Learning and Education (CIRCLE) at the University of Texas Health Science Center. See http://www.uth.tmc.edu/circle/slandry.htm (attached as Exhibit C). Dr. Landry was a featured speaker at First Lady Laura Bush's White House Summit on Early Childhood Learning and at similar White House Summits held around the United States. Id.; Press release, U.S. Dept. of Education, Ready to Read, Ready to Learn; White House Summit on Early Childhood Learning Brings Lessons to Parents and Educators (July 26, 2001) (attached as Exhibit D). see also Press release, The White House, Office of the First Lady, Mrs. Bush's Remarks at the Idaho Early Childhood Cognitive Development Summit (June 10, 2002) (attached as Exhibit E).[2] Assessment tools designed by Dr. Landry and others at CIRCLE "are being widely used in schools as part of the federally-funded Head Start program, which taxpayers support with nearly $7 billion annually." Exhibit A at 3 (citing John O'Neil, Early Repairs in Foundation for Reading, N. Y. Times, Oct. 4, 2006). As noted in Dr. Landry's biography on the CIRCLE website, CIRCLE was chosen by the National Head Start Bureau to do a professional development study in 2002. See Exhibit C. A search of the U.S. Department of Education website for "Susan Landry" produces twenty-two hits. See Exhibit F.

Wireless Generation is an educational technology company that, among other things, produces handheld devices used to assess children's educational progress. Wireless Generation's devices were used to test 45,000 preschool students using the "M-Class:Circle" assessment in 2005 alone. Exhibit B to Exhibit A (O'Neil, N.Y. Times, Oct. 4, 2006). Since at least June 1, 2004, Wireless Generation has been working with Dr. Landry and CIRCLE in the design of the M-Class:Circle assessment and other Wireless Generation tools. Press release, Wireless Generation, Wireless Generation and Center for Improving the Readiness of Children for Learning and Education Collaborate to Create Handheld Computer Versions of Pre-K Assessment (June 1, 2004) (attached as Exhibit G).

---

[1] Education's June 20 letter also stated that CREW's request could not be processed as drafted. As instructed, CREW responded separately to that issue by letter dated July 11, 2007.

[2] In her speech, Mrs. Bush stated: "We know what works. And[,] as you heard from Dr. Landry[,] we are bringing this information to early childhood educators across the country." Exhibit E.

**Education's Denial of CREW's Fee Waiver Request**

Education denied CREW's fee waiver request based on the contention that CREW failed to show how "the subject matter of the requested records [] specifically concern[s] identifiable 'operations or activities of the government.'" Exhibit B at 2, citing Judicial Watch, Inc. v. Rossoti, 326 F.3d 1309 (D.C. Cir. 2003). As stated above, CREW's fee waiver request was grounded in the public interest in the influence and impact on education policy of Dr. Landry, et al. The records CREW seeks will shed light on the degree to which Dr. Landry and others influence such things as federal education policy agendas, programmatic priorities, and/or expenditures associated with early childhood education, such as Head Start, Early Reading First (funded at $75 million in fiscal year 2002)[3] and the Early Childhood Educator Professional Development Program (funded at $15 million in fiscal year 2002).[4]

CREW's fee waiver request clearly states why communications with and regarding Dr. Landry, her affiliated research centers, and Wireless Generation, Inc., concern operations of the federal government. See Exhibit A at 3. For example, as stated in CREW's request and reported in the *New York Times*, Dr. Landry and these entities are all involved with implementation of the Head Start program around the U.S. Id. Dr. Landry herself has appeared around the country on behalf of the White House and the Department of Education, and Education has cited her "research and experience with federally-supported Head Start centers." See Exhibits C, D, E. Records of communications between federal government entities and Dr. Landry thus clearly relate to operations of the federal government, specifically federally-supported Head Start centers.

Education also incorrectly states that "while you[] refer to the Head Start program, your reference is in the context of the products that a school *might* use under the particular program." Exhibit B at 20 (emphasis added). In fact, the relevant sentence in CREW's fee waiver request reads "the assessment tools designed by Dr. Landry and others . . . *are being widely used* in schools as part of the federally-funded Head Start program." Exhibit A (citations omitted) (emphasis added). CREW provided this information as factual support for our contention that the communications we seek concern operations of the government, and we do so again here.

In any case, Education's conclusion that "use[] of such [assessment] products does not shed light on an operation of the government" is inapposite. If the use of these products under Head Start or any other federal program is being discussed in the records of communications CREW seeks, then those records concern operations or activities of the government in exactly the manner CREW suggests is of interest to the public. Those records will reflect the influence and

---

[3] Good Start, Grow Smart: The Bush Administration's Early Childhood Initiative, available at http://www.whitehouse.gov/infocus/earlychildhood/sect3.html#.

[4] Id.

3

effect of various outside entities and individuals who work in and benefit from federal education policy.

## Conclusion

Where, as here, an individual with close ties to the First Lady of the United States is involved with at least one billion-dollar federal program to the extent that a commercial product she helped develop is being used by 45,000 students in one year, it is certainly in the public interest to "understand[] the influence and impact on education policy throughout the United States of [that person] and the relevant corporations and federally-funded research centers with which she is affiliated." These records unambiguously and inarguably involve the operations and activities of the federal government. Under these circumstances, CREW satisfies fully the criteria for a fee waiver. Accordingly, we request that you reverse the Department's determination to deny CREW's fee waiver request.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and
  Ethics in Washington
(202) 408-5565
droth@citizensforethics.org

Enclosures

4

# EXHIBIT A

# CREW | citizens for responsibility and ethics in washington

May 11, 2007

By fax, (202) 245-6623, and First Class mail

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, PCP 9143
Washington, DC 20202-4700

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and Department of Education ("Department") regulations, 34 CFR §§ 5.6 et. seq.

Specifically, CREW seeks records of any and all communications from January 20, 2001, to the present, between officials at the Department of Education and those at the (1) Executive Office of the President, (2) White House Office and (3) Office of the First Lady, regarding any and all of the following:

(A) Susan Landry or Susan Landry Moore;
(B) University of Texas Health Science Center at Houston's Children's Learning Institute;
(C) University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
(D) Texas State Center for Childhood Development (SCECD);
(E) Texas Early Education Model (TEEM); and/or
(F) Wireless Generation's mCLASS:CIRCLE software.

In addition, CREW requests any and all communications from January 20, 2001, to the present, between officials at the Department of Education and:

(A) Susan Landry or Susan Landry Moore;
(B) Officials or employees at the University of Texas Health Science Center at Houston's Children's Learning Institute (CLI);
(C) Officials or employees at the University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education

(CIRCLE);
D) Officials or employees at the Texas State Center for Childhood Development (SCECD); and/or
E) Officials or employees at Wireless Generation.

Please search responsive records regardless of format, medium or physical characteristics. Where possible, please produce records electronically in PDF or TIF format on a CD-ROM. We seek records of any kind, including electronic records, audiotapes, videotapes and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. § 552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

2

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.64, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government programs and procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. § 552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987).

Specifically, these records are likely to contribute to the public's understanding of the influence and impact on education policy throughout the United States of Dr. Susan Landry and the corporations and federally-funded research centers with which she is affiliated. For example, as *The New York Times* reported in 2006, Dr. Landry served on the multi-agency National Early Literacy Panel and has designed widely-used commercial assessment products for early reading students. John O'Neil, Early Repairs in Foundation for Reading, New York Times, Oct. 4, 2006 (attached as Exhibit A). As that article points out, the assessment tools designed by Dr. Landry and others at the University of Texas Center for Improving the Readiness of Children for Learning and Education (CIRCLE) are being widely used in schools as part of the federally-funded Head Start program (Id.), which taxpayers support with nearly $7 billion annually. See http://www.acf.hhs.gov/programs/hsb/research/2007.htm. According to manufacturer Wireless Generation, 45,000 preschool students were tested on the "M-Class:Circle" assessment using the company's hand-held devices in 2005. O'Neil, New York Times, Oct. 4, 2006.

CREW is a non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. In addition, CREW will disseminate any documents it acquires from this request to the public. CREW has established an interactive website where members of the public can analyze and comment on public documents, including documents CREW acquires through the FOIA. See http://foia.citizensforethics.org/home. Currently, this site contains links to thousands of pages of documents CREW acquired from multiple FOIA requests. CREW's main website, www.citizensforethics.org, also includes documents relating to CREW's FOIA litigation, Internal Revenue complaints, and Federal Election Commission complaints. As CREW's websites demonstrate, CREW has an established history of acquiring documents through the FOIA and publishing them on its website for public use.

Under these circumstances, CREW fully satisfies the criteria for a fee waiver.

**Conclusion**

Please respond to this request in writing within 20 days as required under 5 U.S.C. § 552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please contact me at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Daniel C. Roth, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington

Enclosure

4

# EXHIBIT A





October 4, 2006

# Early Repairs in Foundation for Reading

### By JOHN O'NEIL

ALLENTOWN, Pa. — Children with severe reading problems usually struggle for years before getting the help they need. But a growing number of neurologists and educators say that with the latest diagnostic tests, children at high risk for these problems can be identified in preschool and treated before they ever begin to read.

The newer tests, available in computerized versions, measure a child's fluency with the skills that are the foundation of reading: the ability to recognize differences between sounds, the knowledge of letters and the accumulation of basic vocabulary and language skills. The National Early Literacy Panel, a committee of experts convened by a consortium of federal agencies, has found that these tests, when given to 3- and 4-year-olds, predict later reading problems as effectively as they do when they are given to kindergartners and first graders, said the panel's chairman, Dr. Timothy Shanahan of the University of Illinois in Chicago. The committee plans to recommend increased preschool screening when it publishes its findings later this year.

The panel also will recommend some shifts in teaching techniques, said a panel member, Dr. Susan Landry of the University of Texas Medical School at Houston. These include having at-risk children spend more time in small groups that address their specific weaknesses; emphasizing skills like blending sounds (C + AT = CAT), which have been found to be good performance predictors; and training parents to reinforce school lessons.

The point is to identify and attack the problems early, when they are easiest to correct.

"Once a child falls behind, it's very difficult to catch up," said Dr. Angela Fawcett of the University of Sheffield in England.

In the Head Start program here, screening and teaching are increasingly tied together, and a detailed skills assessment is part of the new school year routine. Last month, Karen Gischlar, a reading consultant, sat down with a 4-year-old, Destiny Freer, with a set of blocks, a book of pictures and a handheld computer loaded with M-Class: Circle, one of several formal screening tests on the market.

M-Class: Circle, which was developed by Dr. Landry, measures the skills linked to reading success. Its manufacturer, Wireless Generation, said the test was used to screen 45,000 preschoolers last year; paper versions were used to screen a similar number.

Destiny breezed through the first rounds of a series of one-minute tests, on naming letters and simple objects. She also aced the first rhyming exercise, on whether pairs of words sounded the "same or different."

But her answers became hesitant on the next round, when she was asked to find a rhyme to a word given by Ms. Gischlar. And she had more trouble with higher-level skills, like using the blocks to show the number of

words in a short sentence and clapping out the syllables in words like cowboy, big or wagon.

When the test was done, there on the computer screen were Destiny's scores, color coded in red, green and yellow, and a comparison to her scores from earlier this year, both of which showed Destiny to be developmentally on track, despite some of her faltering.

Another tap of Ms. Gischlar's stylus brought up a list of suggestions for her specific weaknesses — building awareness of word sounds, for instance, by telling a story in rhyme and letting her guess how some sentences end.

Destiny's teacher, Eliza Commareri, said the test helped plan how to individualize instruction and in arranging small groups because the program provides a database showing children with similar needs. The other benefit, she said, was the close link between the screening and a step-by-step curriculum of suggested activities. For teaching syllables, for instance, Ms. Commareri said she might ask the whole class to clap out "play-ground" when they're headed out to recess, or get a few children together to bang out words on a drum.

"It's very helpful because it gives results in all different areas, and activities in all different areas," she said.

Head Start programs have been taking the lead in preschool screening, in large part because low-income children have high rates of language delay; most of the children in the center here arrive more than a year behind.

Reading failure is linked to two different causes. Children with dyslexia tend to have inherited abnormalities in the brain's sound-processing mechanism. But insufficient early exposure to what neurologists call "rich language," a situation more common in poor families, can also undermine the processing abilities that are reading's foundation.

Screening can uncover both kinds of problems, but poor children are the ones who can benefit the most from preschool intervention, said Dr. Peggy McCardle, the chief of the child development branch of the National Institute of Child Health and Human Development.

School policy has traditionally been that children qualify for significant extra help only after they've fallen behind. In 2004, according to federal data, fewer than 10 percent of students getting special education services under the category of specific learning disability — most of whom have reading as their primary problem — were younger than 9.

In August, Education Secretary Margaret Spellings announced new regulations meant to make it easier for elementary schools to offer extra help as soon as students start to struggle.

Dr. Fawcett, who is also the editor of the journal Dyslexia, said making students wait for help was costly, both for schools and students.

A study she led found that a small amount of extra tutoring given to preschoolers with language delays — an hour a week of small-group work for 10 weeks — boosted their skills in comparison with similar children in a control group. The gain exceeded what a year's worth of remediation at age 7 or 8 would produce, she said.

Marj Jones, who runs Head Start programs in Phoenix as the executive director of the Arizona Literacy and Learning Center, is an enthusiastic user of another screening test, Get Ready to Read, developed by the

National Center for Learning Disabilities. The center's executive director, James H. Wendorf, estimated that the test was used to screen about 70,000 preschoolers each year by teachers or by parents using the interactive version available at getreadytoread.org. But Ms. Jones said that even the best testing produces only a limited gain unless it is part of a larger effort.

"You can go in and screen a child, but if you don't have continuous support from teachers and parents, you've only accomplished a short-term goal," she said.

Copyright 2006 The New York Times Company

Privacy Policy | Search | Corrections | **RSS** | First Look | Help | Contact Us | Work for Us | Site Map

# EXHIBIT B



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

June 20, 2007

Mr. Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00655-F

Dear Mr. Roth:

This letter is in response to your fax dated May 11, 2007 requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Your request was received in this office on May 15, 2007. You asked for the following information:

1. All communications from January 20, 2001, to the present, between officials at the Department of Education and those at the (1) Executive Office of the President, (2) White House Office and (3) Office of the First Lady, regarding any and all of the following:
    a. Susan Landry or Susan Landry Moore;
    b. University of Texas Health Science Center at Houston's Children's Learning Institute;
    c. University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
    d. Texas State Center for Childhood Development (SCECD);
    e. Texas Early Education Model (TEEM); and/or
    f. Wireless Generation's mCLASS: CIRCLE software.

2. All communications from January 20, 2001, to the present, between officials at the Department of Education and:
    a. Susan Landry or Susan Landry Moore;
    b. Officials or employees at the University of Texas Health Science Center at Houston's Children's Learning Institute (CLI);
    c. Officials or employees at the University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
    d. Officials or employees at the Texas State Center for Childhood Development (SCECD); and/or
    e. Officials or employees at Wireless Generation.

We are unable to process your request at this time. As you are aware, FOIA requests must reasonably describe the records that are sought in order for Department employees, with knowledge of the subject matter, to identify and locate potentially responsive documents. 5 U.S.C. § 552(a)(3)(A) (2000). Your request seeks access to "any and all communications" between Department officials and officials at "(1) Executive Office of the President, (2) White

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-4500
www.ed.gov

Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.

Page 2 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00655-F

House Office and (3) Office of the First Lady" as well as the communications of Department officials
with Susan Landry and certain entities. The scope of your request encompasses a potentially large
volume of information on broad topics related to anyone in the Department and anyone at certain outside
organizations, without identifying specific individuals or any subject(s). These facts are especially
critical to items 2b through 2e of your request. The Department has concluded that your request as stated
does not describe the records sought with a reasonable amount of detail such that a Department employee
would be able to locate potentially responsive documents with a reasonable amount of effort. See Dale v.
Internal Revenue Service, 238 F.Supp.2d 99 (D. D.C. 2002). Consequently, the Department is unable to
process your request as it is currently stated.

## Fee Waiver

In addition, you have requested a fee waiver for your request. The requester bears the burden of
justifying entitlement to a fee waiver. See Casad v. Department of Health & Human Services, 2003 U.S.
Dist. LEXIS 13007 (D. D.C. June 20, 2003). To meet this burden, a requester must satisfy two statutory
requirements before the Department may waive or reduce properly assessed fees: (1) disclosure of the
information must be in the public interest because the information primarily benefits the general public
and is likely to contribute significantly to public understanding of the operations or activities of the
government; and (2) disclosure of the information must not be primarily in the commercial interest of the
requester. 5 U.S.C. § 552(a)(4)(A)(iii)(2000); see also 34 C.F.R. § 5.64(a). Moreover, a requester must
address both factors in sufficient detail in order for an agency to determine whether it can reduce or waive
the fees. Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003).

In order to determine whether the disclosure of the information responsive to the request furthers the
narrow public interest cognizable under the FOIA, the Department must consider the following four (4)
factors in sequence:

1. The subject matter of the requested records themselves must specifically concern identifiable
   "operations or activities of the government";
2. In order for the disclosure to be "likely to contribute" to an understanding of specific
   government operations or activities, the disclosable portions of the requested information
   must be meaningfully informative in relation to the subject matter of the request;
3. The disclosure must contribute to the "understanding of the public at large," as opposed to
   that of the individual requester or a narrow segment of interested persons; and
4. The disclosure must "contribute significantly" to public understanding of government
   operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7,
2004); see also 34 C.F.R. § 5.64(b)(1) and (2). Only if all four elements have been met will the
Department conclude that a requester has satisfied the first prong of the public interest element of the
statutory requirement for a fee waiver.

Where the Department concludes that the public interest requirement has been met, it may waive or
reduce applicable fees only where it also finds that "disclosure of the information . . . is not primarily in
the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii)(2000). In

Page 3 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00655-F

order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

1. Does the request involve any "commercial interest of the requester" (if not, the requester satisfies the second prong of the statutory fee waiver test); and
2. If so, the agency must balance the requester's commercial interest against the identified public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee waiver or reduction may be granted only where the public interest in disclosure is greater in magnitude than the requester's commercial interest.

See also 34 C.F.R. § 5.64(b)(3).

For your information, the Department does not customarily grant blanket waivers, but rather considers each waiver request on a case-by-case basis.

The Department has reviewed your request and denies the request because it fails to satisfy the first factor of the public interest analysis. As stated above, the first factor of the public interest analysis requires that the subject matter of the requested records specifically concern an identifiable operation or activity of the government. In order to satisfy this element, the requester must identify a nexus between the requested records and the benefit to the public. See Nat'l Treasury Employees Union v. Griffin, 811 F.2d 644 (D.C. Cir. 1987). Moreover, the requester must satisfy this burden with a level of specificity, beyond generalized statements that the request somehow relates to a government operation or activity. Judicial Watch v. U.S. Dep't of Justice, 122 F.Supp.2d 5, 9 (D. D.C. 2000); see Larson v. C.I.A., 843 F.2d, 1481, 1483 (D.C. Cir. 1988).

In your request you state that "these records are likely to contribute to the public's understanding of the influence and impact on education policy throughout the United States of Dr. Susan Landry and the corporations and federally-funded research centers with which she is affiliated." You also state that an assessment tools designed by Dr. Landry "are being widely used in schools as a part of the federally-funded Head Start program[.]"   As stated above, the Department has concluded that your request does not reasonably describe the records sought. You have referred to assessment tools designed by Dr. Landry that are used by schools as part of the Head Start program. You also refer to Dr. Landry's (and her affiliates) influence and impact on educational policy. However, you have not stated how the records sought relate to a specific government activity or program. And while your refer to the Head Start program, your reference is in the context of the products that a school might use under the particular program. However, the used of such products does not shed light on an operation or activity of the government.

In sum, the Department denies your request for a fee waiver in the present case. Since you have failed to meet your burden regarding a fundamental threshold requirement of the legal standard for analyzing fee waiver requests under the FOIA, the Department cannot address the remaining factors of the fee waiver analysis. However, the Department may reconsider this decision should you choose to submit supplemental or clarifying information.

Fees are charged for searching/reviewing and duplication for responsive records. The fee is calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The search and the review fee are calculated based on the hourly rate of pay, plus 16% administrative charge and the duplication costs are ten cents per photocopied page. Our regulations, 34 CFR § 5.61 require us

Page 4 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00655-F

to allow you to modify your request if the cost is more than $25.00. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is to be greater than $250.00, the requester <u>must pay</u> in advance.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Your appeal should be received by the FOIA office on or before July 25, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

**Appeal Address:**

U.S. Department of Education
Chief Information Officer
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: FOIA Appeals
Washington, DC 20202-4500

Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request. Please send your clarification letter to the U.S. Department of Education, ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC 20202-4700, or send it by e-mail: EDFOIAManager@ed.gov.

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

# EXHIBIT C

# (C.I.R.C.L.E) CLINICAL STAFF



**Susan Landry**
Medical School
Michael Matthew Knight Professor
Chief, Division of Developmental Pediatrics
Phone: 713-500-3710
Email: Susan.Landry@uth.tmc.edu

Dr. Susan H. Landry is a Developmental Psychologist and the Michael Matthew Knight Professor in the Department of Pediatrics at The University of Texas Health Science Center at Houston (UTHSC-H). She is also the Chief of the Division of Developmental Pediatrics and the Director of the Center for Improving the Readiness of Children for Learning and Education (CIRCLE) in the Department of Pediatrics. The Center is made up of over 30 staff in the research, clinical, and educational areas. Her activities involve conducting numerous research projects and training activities related to the goal of promoting quality learning environments for young children.

She and her staff also carry out a large community based project in the Acres Homes area of Houston. This and other projects place a special emphasis on the effects of different aspects of caregiving on children's development and ways to promote quality environments. A large research database on early childhood has been developed from Dr. Landry's numerous research programs supported by the National Institutes of Child Health and Development (NICHD), foundations, and the UTHHSC. These include longitudinal evaluations of biological and environmental influences on children's development from infancy through elementary school age years. More than 70 peer-reviewed publications and over a dozen chapters describe the findings of these research studies. The Center, with funding from the U.S. Department of Education, the TX Education Agency, and several foundations is currently involved in using the knowledge gained from years of studying young children to help promote the national goals of early childhood literacy initiatives. These include conducting and evaluating model training programs for Head Start and Pre-Kindergarten teachers across Texas and a number of other states with the goal of improving young children's language and early literacy and math skills. Evaluations of these programs show significant gains in classroom quality and children's skill development.

Dr. Landry was a featured speaker at Laura Bush's White House Summit and mini White House Summits held across the United States discussing cognitive development in young children. She has been a featured and keynote speaker for a number of conferences regarding this issue. Most recently, she was invited to present her research before Senator Edward Kennedy, Department of Education representatives, and others in Washington D.C. In addition, CIRCLE has been designated by the National Head Start Bureau to provide Language and Literacy professional development and follow up to 2300 Early Literacy Specialists across the United States during summer 2002.

Privacy Policy | Linking Policy
© 2002-present, The University of Texas Health Science Center at Houston

**EXHIBIT D**



**ED.gov**    **U. S. Department of Education**
*Promoting educational excellence for all Americans*

Search ED.gov » [                ] GO

Advanced Search

Students    Parents    Teachers    Administrators

## Press Room

**Press Releases**
- Latest
- 2007
- 2006
- 2005
- 2004
- 2003
- 2002
- Archive

Speeches

Fact Sheets, Op-Eds

Photos

Audio & Video

Events

Senior Staff

Newsletters

Federal Register

New at ED.gov

About ED

Budget

Press Room

Publications

Teaching Resources

Answers

Help

Online Services

Recursos en español

Web Survey

**PRESS RELEASES**
**Ready to Read, Ready to Learn**
White House Summit on Early Childhood Learning Brings
Lessons to Parents and Educators
**ARCHIVED INFORMATION**

**FOR IMMEDIATE RELEASE:**
July 26, 2001

**Contact:** Education Department
Office of Public Affairs
202-401-3026

*Laura Bush hosts summit to start national dialog on preparing young children to learn.*

WASHINGTON, D.C. -- Laura Bush today kicked off the White House Summit on Early Childhood Cognitive Development -- Ready to Read, Ready to Learn, featuring the research and recommendations of some of the nation's top early childhood learning specialists. Mrs. Bush was joined by her co-hosts, U.S. Secretary of Education Rod Paige and U.S. Secretary of Health and Human Services Tommy G. Thompson, and a group of more than 400 government, education, community, and philanthropic leaders from across the country who gathered at Georgetown University in Washington, D.C. for the two-day summit meeting.

The summit was created by Mrs. Bush, a former teacher and school librarian, to highlight the early learning activities that parents and educators can use to prepare young children for school. Mrs. Bush hosted a similar conference in Texas in 1998. "We all have a duty to call attention to the science and seriousness of early childhood cognitive development," said Mrs. Bush. "The years from the crib to the classroom represent a period of intense language and cognitive growth. Armed with the right information, we can make sure every child learns to read and reads to learn."

"Together the White House and the departments of health and human services and education can raise public awareness of the value of early childhood development," Secretary Thompson said, "and Laura Bush is exactly the person we want and need to lead that charge for our children. We can have no more important national conversation than a the one about what parents and teachers can do to give all of our children a real chance for growth and learning."

The new assistant secretary of education for educational research and improvement was among the researchers to present information on proven methods for teaching our youngest children. Grover "Russ" Whitehurst, spoke to the summit audience about how poverty affects the children's acquisition of pre-reading skills, and explained proven methods for parents and adults to intervene in the lives of these children to improve their skills and prepare them to enter our school system.

Patricia Kuhl, co-director of the Center for Mind, Brain, and Learning at the University of Washington, explained to the audience how babies begin to learn speech sounds in the first year of life. "The studies show that by one year of age," Kuhl said, "infants all over the world are sorting out which sounds their language uses, what sounds can be combined in their language, and the patterns of words used in that language."

Based upon her research and experience with

**SECRETARY'S CORNER**
- No Child Left Behind
- Higher Education
- American Competitiveness
- Meet the Secretary

**NoChild**

**Related Topics:**
- **Helping America's Youth**

federally-supported Head Start centers, Susan Landry, Professor of Pediatrics at the University of Texas Houston Health Science Center, described how parents and Head Start teachers can be taught intervention skills to help the young children in their care. "Children's cognitive development," Landry said, "can be supported in ways that are responsive to a broad range of other abilities including reasoning skills, social competence, and emotional health."

The summit will continue tomorrow with presentations by U.S. Secretary of Education Rod Paige, child development expert Reid Lyon, new assistant secretary of education for elementary and secondary education Susan Neuman, and Mrs. Lynne Cheney.

### ###

**Speakers who addressed the first session of the summit are listed below in the order in which they appeared:**

Margaret La Montagne, assistant to the president for domestic policy (moderator)
John J. DeGioia, president, Georgetown University
Mrs. Laura Bush
U.S. Rep. Anne M. Northup (R-Ky.)
U.S. Secretary of Health and Human Services Tommy Thompson
Grover Whitehurst, assistant secretary for educational research and improvement
Sen. Edward M. Kennedy (D-Mass.)
Barry S. Zuckerman, Perri Klass and Elena Fuentes-Afflick -- *Reach Out and Read*
Patricia Kuhl, Co-Director, Center for Mind, Brain and Learning, University of Washington
Darion Griffin, assistant director, educational issues, American Federation of Teachers
Sarah M. Greene, chief executive officer, National Head Start Association
Susan H. Landry, Professor of Pediatrics, University of Texas at Houston
Blanca Enriquez, executive director, Regional Head Start, El Paso, Texas

Top

⎙  Printable view  ▽  Share this page

Last Modified: 05/14/2007

# EXHIBIT E



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH



CLICK HERE TO PRINT

For Immediate Release
Office of the First Lady
June 10, 2002

## Mrs. Bush's Remarks at the Idaho Early Childhood Cognitive Development Summit
As Delivered
Boise, Idaho

Thank you very much. Governor and Mrs. Kempthorne, thank you for hosting this summit.

Mrs. Leavitt, Mrs. Gerringer, distinguished guests..and I must say, this is a very distinguished group - you represent state education agencies, school districts, the university community, head start and other early childhood programs, corporations and foundations -- thank you for being here for this important discussion about America's children and their future.

President Bush and I and all Americans want our schools to do a good job of educating children; we want our teachers to teach them well; and we want children to learn well.

As you've just heard, years of research in early childhood cognitive development tells us what we can do to make sure children are ready to read and learn when then enter school.

Last July I hosted the White House Summit on Early Childhood Cognitive Development.

We heard from some of America's most respected and innovative researchers in the field of cognitive development, many of whom are here today, and from people who've put that research to work and have seen great results.

Because of nationwide interest in early childhood development, several participants from the White House Summit suggested that I take the show on the road, so to speak.

So, we have hosted regional summits in Ohio and Arkansas, and this, of course, is the third regional summit.

The presenters have given you a great deal of information today with one central theme, and that is: the first five years of life are a critical time for children to develop the physical, emotional, social, and cognitive skills they will need for the rest of their lives.

Infants and toddlers need parents and caregivers who understand the importance of these early years.

If we take the time to talk to and listen to children -- to read with them, to surround them with books, and to help them put names on things in their environment -- then we will help establish the skills, knowledge, and confidence that will help them learn to read and succeed in school.

Children do not automatically learn to read - they need help and practice.

Moms, dads, grandparents - all those who care for a young child at some point during the day -- need to know what they can do to enhance children's language skills and prepare them for success in school.

A new series of magazines for parents and caregivers called "Healthy Start, Grow Smart" is designed to do just that.

This monthly guide will be published in both English and Spanish and will be available to parents every

month during their baby's first year of life.

These are two of the magazines, for newborns and one-month-old babies, and they're available for all of you today. These magazines will provide valuable and age-appropriate information about health, safety, nutritional needs, and early cognitive development that has been proven to help babies thrive.

Grants from the U.S. Department of Health and Human Services will be made available to states to mail these magazines to mothers with newborns who are receiving Medicaid services.

You can also find these on the White House website at www.whitehouse.gov/firstlady.

Today's event gives me the chance to thank two of the editors of the magazine - Dr. Susan Landry and Dr. Craig Ramey.

Some parents and caregivers may not realize how important it is to make time for language and literacy building activities.

They may think that is the job of the pre-schools and early childhood centers, or that television is a good substitute.

Children's television programs can enhance, but not replace early learning activities. Educational shows like "Between the Lions" or Mr. Rogers' Neighborhood are merely a starting point for further education once the television is turned off.

I support PBS's new "Designated Reader" campaign that will encourage millions of parents and caring adults to read to young children every day.

Many thanks to those from PBS who are here today for supporting early childhood education.

We must also close the gap between the best research and current practices in our Head Start and other pre-school programs.

Our early childhood educators deserve training based on the latest research proven to help prepare children for success in school.

We know what works. And as you heard from Dr. Landry we are bringing this information to early childhood educators across the country.

The Early Reading First part of the No Child Left Behind Act, passed overwhelmingly by Congress and signed into law by President Bush, includes funds to train early childhood educators so they can incorporate into daily activities pre-reading and language skill development for young children.

Journalist David Shribman spent a year asking people about the role teachers played in their lives.

The often humorous and heart-warming answers were compiled into a book titled, "I Remember my Teacher."

A superintendent of schools in Concord, New Hampshire, said:

"I remember Miss Gray. She taught first grade in North Quincy, Massachusetts. I remember her with graying hair, wearing gray, and looking gray. But I remember one thing: She taught me how to read."

While we face a challenge of making sure children are ready to learn to read when they start school, this challenge is not insurmountable.

By working together, we can make sure that parents, early childhood teachers, and other caring adults

have the skills and information to help their children succeed.

A child's success is not a matter of chance but a matter of choice - choices that we as adults make for our young children and choices that they make for themselves later in life. Thank you for choosing to be here today and for working with us to ensure no child is left behind.

I encourage you to use the information you heard and the contacts you made to help enlist parents, educators, physicians, child care providers, and others in your communities to make a difference in the education of our young children.

Many thanks to our hosts and sponsors, and thanks especially to our distinguished presenters for being here.

Thank you.

# # #

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2002/06/20020610-8.html

🖶 CLICK HERE TO PRINT

# EXHIBIT F



**ED**.gov    **U. S. Department of Education**
*Promoting educational excellence for all Americans*

Search ED gov »  [                    ]  GO
Advanced Search

Students    Parents    Teachers    Administrators

About ED
Budget
Press Room
Publications
Teaching Resources

Answers
Help
Online Services
Recursos en español
Web Survey

**SEARCH**
## Search Results

○ New Search
◉ Search Within Results  [                    ]  GO
   Help with Search

Search Results for:**"Susan Landry" |-ed.status:archived**

Page | **1** |

1 - 22 of 22 Shown        Results per page    10 | **25** | 50

**Sort by:** Relevance | Date | Title
**Descriptions:** Show | Hide

**May 2002 Satellite Town Meeting Online Resources
Home - Early Childhood Education**
May 2002 Satellite Town Meeting Online Resources Home -
Early Childhood Education (Aug 07, 2003)

**May 2002 Satellite Town Meeting Online Resources
Home - Early Childhood Education**
May 2002 Satellite Town Meeting Online Resources Home -
Early Childhood Education (Aug 07, 2003)

**Earaly Childhood Cognitive Development -- Early
Reading and Scientifically-Based Research**
Materials for the February 2003 National Title I Directors'
Conference of Elementary and Secondary Education Student
.. (Apr 08, 2003)

**Department Awards Grants to Evaluate Preschool
Curriculums**
This Press Release announces that the U.S. Department of
Education is awarding seven new grants under the Preschool
Curriculum Evaluation .. (Jul 25, 2002)

**Early Learning Summit for the Northwest Region (June
10, 2002)**
Proceedings of the 2002 Early Learning Summit for the
Northwest Region: The Beginnings. The summit was held in
Boise, Idaho. (Jun 10, 2002)

**A Summit on Early Childhood Cognitive Development
(April 30, 2002)-- Pg 3**
On April 30, 2002, Laura Bush hosted a summit on early
childhood cognitive development in Little Rock, Arkansas.
Three .. (Apr 30, 2002)

**05 10**
ED.gov A r c h i v e d I n f o r m a t i o n ED REVIEW May 10,
2002 ..a bi-weekly update on U.S. Department of Education
activities relevant to the Intergovernmental and .. (May 25,
2005)

**The Importance of Knowledge in Early Learning
Development**
The Importance of Knowledge in Early Learning Development
The Importance of Knowledge in Early Learning Development
Several years ago, in .. (Sep 14, 2004)



SECRETARY'S CORNER
» No Child Left Behind
» Higher Education
» American Competitiveness
» Meet the Secretary

**NoChild**

**Related Topics:**
• **No Related Topics
Found**

**EXHIBIT G**

**wireless generation®**

# Press Release

**Wireless Generation and Center for Improving the Readiness of Children for Learning and Education Collaborate to Create Handheld Computer Version of Pre-K Assessment**

**New mCLASS®:CIRCLE™ Assessment Gauges Children's Understanding of Early Literacy Concepts, Helps Educators to Promote Development**

New York City, June 1, 2004- Wireless Generation, the leading developer of preK-12 observational assessment software, and the University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE) today announced a collaboration to create a handheld computer version of CIRCLE's early literacy observational assessment.

The CIRCLE assessment will run on the Wireless Generation mCLASS software platform, which speeds and simplifies assessment administration by putting it on a handheld computer used by the teacher, and provides educators with Web-based tools for reporting and classroom planning. The handheld version of the assessment, known as mCLASS:CIRCLE software, will be available in English and Spanish for use starting Fall 2004. Wireless Generation has been awarded the exclusive worldwide license to offer the CIRCLE assessment on handheld devices.

Led by Dr. Susan H. Landry, developmental psychologist and Chief of the Division of Developmental Pediatrics at the University of Texas Health Science Center at Houston, CIRCLE is a research center that has developed a comprehensive, nationally recognized approach to early childhood literacy education. In addition, Governor Rick Perry has named CIRCLE as the Texas state center for early childhood development. CIRCLE's research-based early literacy assessment, given three times a year, helps early childhood educators to understand each child's degree of development in letter naming, vocabulary, and phonological awareness.

While children interact with print materials, mCLASS:CIRCLE software allows teachers to record children's assessment responses on the handheld, then receive immediate feedback and suggested activities for fostering early literacy development based on the needs of the whole class, groups of children, and individual children. mCLASS:CIRCLE software also enables teachers to create evolving portfolios that include anecdotal notes and observations of socio-emotional development, book and print awareness, and early writing skills. With the push of one button to "sync" the handheld to a computer, information on each child is uploaded to a secure Web site, where teachers can view reports that assist in classroom planning; inform conversations with colleagues and administrators; and promote communication with parents about their child and ways to foster early literacy skills at home.

As part of a two-year study of CIRCLE's early education model, mCLASS:CIRCLE is currently being piloted in 110 classrooms across Texas that represent a cross-section of early childhood environments, such as Head Start, Title I pre-K, and early childhood centers. In addition, the Texas Head Start Ready to Read program has selected the mCLASS:CIRCLE assessment for use starting this fall.

"The CIRCLE assessment has been designed to help early childhood educators expand their insight into where the young children in their care fall along the developmental continuum, and find ideas and activities tailored to the children's particular cognitive and emotional needs. This kind of early childhood assessment should be an accepted, regular practice so that children get maximum

benefit from their first classroom experiences," said Dr. Landry. "Wireless Generation's mCLASS:CIRCLE assessment is easy to give and integrate into teacher practice, taking only 12 minutes to complete. In addition, the ability to use the software to develop individual portfolios that grow over time, for teachers to refer to repeatedly, is an invaluable tool for thoughtful classroom planning."

"We have focused our work to date on making the most commonly used, paper-based K-3 reading assessments easier to give and the data they yield more valuable. Our collaboration with CIRCLE allows us to bring these same benefits to early childhood educators, and help them as they prepare young children for school," said Larry Berger, Co-Founder and CEO of Wireless Generation. "CIRCLE is nationally recognized for its contributions to early childhood and early literacy development. We could not ask for a better partner in this endeavor."

Wireless Generation offers mCLASS:CIRCLE software in both English and Spanish. More information is available online at www.wirelessgeneration.com.

**About Wireless Generation**
Wireless Generation is a privately held company, founded on the belief that teachers and school administrators would benefit from a new generation of highly mobile, easy-to-use software that supports their assessment and information management needs. The company offers a wide range of handheld observational assessment tools. Located in New York City, Wireless Generation can be reached at (212) 213-8177 and on the Web at www.wirelessgeneration.com.

**About Center for Improving the Readiness of Children for Learning and Education (CIRCLE)**
Housed at the University of Texas Health Science Center at Houston, CIRCLE is engaged in numerous research, community programs and training activities related to the goal of promoting quality learning environments for young children. Training in the early childhood component of Even Start family literacy is one aspect of their work. More information about CIRCLE and its work can be found on the Web at http://www.uth.tmc.edu/circle/.

Copyright © 2000-2006 Wireless Generation, Inc., leaders in educational assessment and professional development. All rights reserved.

# EXHIBIT 5



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

**OCT 2 2 2007**

ASSISTANT SECRETARY

Daniel C. Roth, Esq.
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC  20005

Re:  FOIA Appeal – FOIA Request No. 07-00655-F

Dear Mr. Roth:

I am writing in response to your letters dated July 11 and July 24, 2007, appealing the Department's June 20, 2007 decision to deny your May 11, 2007 request for access to Department records pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, administratively denominated Request No. 07-00655-F,[1] and for a waiver of associated processing fees.

Background

Your Request No. 07-00655-F sought access to:

I. Records of any and all communications from January 20, 2001, to the present, between officials at the Department of Education and those at the (1) Executive Office of the President, (2) White House Office and (3) Office of the First Lady, regarding any and all of the following:

    (A) Susan Landry or Susan Landry Moore;
    (B) University of Texas Health Science Center at Houston's Children's Learning
        Institute;
    (C) University of Texas Health Science Center at Houston's Center for Improving
        the Readiness of Children for Learning and Education (CIRCLE);
    (D) Texas State Center for Childhood Development (SCECD);
    (E) Texas Early Education Model (TEEM); and/or
    (F)  Wireless Generation's mCLASS:CIRCLE software.

and

---

[1]  While your July 24, 2007 letter initially references another FOIA request (No. 07-00661-F), it is clear from the body of that letter that it in fact concerns Request No. 07-00655-F.

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

Page 2—Mr. Roth

II. Any and all communications from January 20, 2001, to the present, between officials at the Department of Education and:

(A) Susan Landry or Susan Landry Moore;
(B) Officials or employees at the University of Texas Health Science Center at Houston's Children's Learning Institute (CLI);
(C) Officials or employees at the University of Texas Health Science Center at Houston's Center for Improving the Readiness of Children for Learning and Education (CIRCLE);
(D) Officials or employees at the Texas State Center for Childhood Development (SCECD); and/or
(E) Officials or employees at Wireless Generation.

Your request also asked for a waiver of associated processing fees, asserting, inter alia, that the records that are the subject of your request "are likely to contribute to the public's understanding of the influence and impact on education policy throughout the United States of Dr. Susan Landry and the corporations and federally-funded research centers with which she is affiliated." Request at p. 3.

By letter dated June 20, 2007, the Department denied both your FOIA request and your fee waiver request, on grounds, respectively: (1) that your request did not describe the records sought with sufficient specificity to enable Department employees with knowledge of the subject matter of your request to identify and locate potentially responsive documents; and (2) that your request for a fee waiver did not meet the first criterion for such a waiver, namely that it failed to show a nexus between the requested records and benefit to the public by demonstrating that the subject matter of the documents responsive to the request concern a specific government activity or program. Your appeal, challenging both bases for the Department's denial, ensued.[2]

Decision on Appeal

Based upon a careful review of the correspondence between the parties, the nature of your request and the information it sought, the arguments asserted in your appeal, and applicable legal precedent, I find that the Department properly denied your FOIA request because it failed to reasonably describe the records sought. I must therefore deny your appeal as it pertains to the denial of your FOIA request. The reasons for my decision are set forth below.

In view of the denial of your FOIA request, your request for a fee waiver is now moot. It is therefore unnecessary for me to make a determination regarding that aspect of your appeal.

---

[2] Your July 11, 2007 letter appealed the Department's denial of your FOIA request; and your July 24, 2007 appealed its denial of your request for a fee waiver. The two appeals have been consolidated for the purposes of this determination.

Page 3—Mr. Roth

Discussion

The FOIA requires that a request reasonably describe the records sought.  5 U.S.C. §
552(a)(3)(A).  "[An agency] is under no obligation to release records that have not been
reasonably described.  "The linchpin inquiry is whether the agency is able to determine
precisely what records are being requested."  Tax Analysts v. IRS, 117 F.3d 607, 610
(D.C. Cir. 1997).  A description is sufficient if it enables a professional employee of the
agency who is familiar with the subject matter of the request to locate the records with a
reasonable amount of effort.  Marks v. United States, 578 F.2d 261, 263 (9th Cir. 1978).
Broad, sweeping requests lacking specificity are not sufficient.  American Fed. of Gov't
Employees v. Dep't of Commerce, 632 F. Supp. 1272, 1277 (D.D.C. 1986).

In its June 20, 2007 letter denying your FOIA request, the Department found that your
request did not meet the specificity standard described above, stating, "The scope of your
request encompasses a potentially large volume of information on broad topics related to
anyone in the Department and anyone at certain outside organizations, without
identifying specific individuals or any subject(s)."  Denial at p. 2.  In view of the
unreasonably broad scope of your request as written, the Department invited you to
provide additional clarifying information.  Your appeal did not provide the requested
clarification but instead asked the Department for information, stating: "To the extent
searching for [the responsive] records presents a scope problem, or to the extent CREW
could narrow its request to reduce the burden on [the Department] without abandoning
any right to documents under FOIA, please provide information other than the conclusion
that CREW's request as submitted 'encompasses a potentially large volume of
information.'"  Appeal at p. 3.

The Department responded to your request for additional information in a letter dated
August 23, 2007:

> In response to your invitation to discuss further clarification of the scope of your
> request, the Department is providing you with the following information:
>
> - Your request for 'any and all communications from January 20, 2001, to
>   the present, between officials at the Department of Education' fails to
>   identify the Department officials whose communications are sought.
>
> - There are several programs implicated by the persons and entities
>   identified in your request.  Your request fails to identify a specific
>   program or a specific subject matter focus for the Department's search for
>   responsive records.

Page 4—Mr. Roth

- The Department concluded that the two programs most likely implicated by your request – Early Reading First and Reading First – were created with the enactment of the No Child Left Behind Act of 2001. Thus the time period identified in your request predates the legislation that is the subject of the request.

August 23, 2007 letter at p. 1. The Department's August 23, 2007 letter further advised you that the Department would be unable to process your request further unless and until it received clarification from you regarding the issues identified above. Id. at p. 2. However, you have submitted no further clarifying information in the time that has passed since we requested additional information from you. Under the circumstances, I am sustaining the Department's initial decision to deny your request for failure to reasonably describe the records sought. I must therefore deny your appeal.

Right to Judicial Review

This letter constitutes exhaustion of the administrative remedies available to you under the FOIA. You have the right to judicial review of this decision, pursuant to 5 U.S.C. § 552(a)(4), in the United States District Court for the district in which you reside, in which you have your principal place of business, in which the records are maintained, or for the District of Columbia.

Sincerely,

Michell Clark

# EXHIBIT 6



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

August 23, 2007


Daniel C. Roth, Esq.
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC  20005

RE: FOIA Request No. 07-00661-F

Dear Mr. Roth:

This letter is in response to your letter dated July 3, 2007, regarding your May 16, 2007 request for information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.  By letter dated June 20, 2007, we advised you of our determination that your request could not be processed because it does not describe the records sought in sufficient detail to enable Department staff with knowledge of the subject matter of the request to identify and locate responsive documents with a reasonable amount of effort.[1]  Your July 3, 2007 letter challenges this determination.

Your July 3, 2007 letter you sought "clarification from Education as to whether its electronic files are keyword or recipient searchable, or capable of being searched using some other method[,]" and asked "If Education's electronic files are not searchable, please confirm whether or not Education maintains paper copies of those same records that can be searched in response to CREW's FOIA request."  You also asked us to "clarify and explain the reasons the Department cannot process CREW's request of May 16, 2007."

I note initially that the FOIA does not impose an obligation upon agencies to provide requesters with detailed descriptions of their electronic databases and/or electronic search capabilities.  Consequently, the Department will not respond to your request for such information.  However, in response to your request for additional information concerning the reasons the Department cannot process your May 16, 2007 request, the following summary of deficiencies noted in your request is provided:

- Your request seeks access to "any records" from several Department offices, but fails to identify further the types or categories of "records" for which the Department should conduct its search.

- The No Child Left Behind Act of 2001 was enacted on January 8, 2002.  The start time of your request precedes the enactment of the statute.

---

[1] The June 20, 2007 letter also denied your request for a fee waiver.  However, the Department will address your appeal of that determination in a separate letter.

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-4500
www.ed.gov

Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.

Page 2 - Citizens for Responsibility & Ethics in Washington
No. 07-00661-F

- Your July 3, 2007 letter states that you seek "records that reflect contacts with," while your May 16, 2007 request sought access to "any records ... of or relating to any contact." The two statements implicate different classes or categories of records. Given this inconsistency, the Department cannot reasonably determine the focus of your request.

- If the Department simply relied on your original request of May 16, 2007 seeking access to "any records ... of or relating to any contact," the Department cannot reasonably conclude what types of record would be responsive to the request (meeting notices? meeting minutes? Meeting agenda? Taxi cab receipt?).

- You request seeks "any records" from at least three Department offices, each of which has a staff of more than 30 people; thus, the request would require the Department to search the records of every member of the staffs of those offices whether that person is likely to have responsive records or not.

The Department is unable to process your request further unless and until we receive clarification from you regarding the issues identified above. Should you wish us to process your request further, please send the requested clarifying information to the U.S. Department of Education ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC 20202-4700, or by e-mail to: EDFOIAManager@ed.gov.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

# EXHIBIT 7



**CREW** | citizens for responsibility and ethics in washington

May 15, 2007

John P. Higgins, Jr.
Inspector General
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-1500

**BY FAX:** 202-245-7628

Dear Inspector General Higgins:

Citizens for Responsibility and Ethics in Washington ("CREW") respectfully requests that you investigate the extent to which Department of Education employees have been using non-governmental e-mail accounts for official business -- with the full knowledge of the Department's Office of General Counsel -- in violation of federal law.

On March 28, 2007, CREW filed a Freedom of Information Act ("FOIA") request with the Department of Education, seeking records related to the Reading First program. The Department's FOIA office and CREW's counsel, Dan Roth, arranged a conference call on May 9, 2007, to discuss the Department's response. In addition to Mr. Roth, participating in the call were Angela Arrington and Maria-Teresa Cueva from the FOIA office, Marcella Goodridge and Dennis Koeppel from the Office of the General Counsel, and James Butler from the Office of Elementary and Secondary Education.

During the course of the telephone conference, the FOIA officers and Ms. Goodridge explained to Mr. Roth the difficulties in searching Department emails. Specifically, Department officials told Mr. Roth that without identifying a specific recipient or sender, it is impossible to search for email pertaining to any particular subject matter. Without prompting, Ms. Goodridge then stated that Department personnel "often use private email addresses," and that the Department "wouldn't have access to that." Mr. Roth asked whether private email accounts were used for official business and Ms. Goodridge replied that they were, adding that this issue has arisen in the past in reference to other FOIA requests.

On May 14, 2007, Mr. Roth called Ms. Arrington for clarification on several issues. During the course of that conversation, Mr. Roth asked if he had understood Ms. Goodridge correctly to state that because Department of Education employees sometimes use private email addresses for official business, such material would not be included in the Department's response to CREW's FOIA and that this issue had come up in the past. Ms. Arrington confirmed Ms. Goodridge's statements.

The Federal Records Act ("FRA"), 44 U.S.C. §§ 3301 et seq., governs the preservation and disposal of federal records. Among other things, the FRA ensures "[a]ccurate and complete

Mr. John P. Higgins, Jr.
May 15, 2007
Page 2

documentation of the policies and transactions of the Federal Government," as well as "judicious preservation and disposal of records." 44 U.S.C. § 2902. To fulfill this purpose, the FRA requires the head of each agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency." Id. § 3101. Under the statute, each agency must also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," id. § 3102, and must "establish safeguards against the removal or loss of records" the agency head determines are necessary and required by regulations of the Archivist. Id. § 3105.

The FRA also prescribes the exclusive mechanism for disposal of federal records, which it defines to include:

> all books, papers, maps, photographs, machine readable materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency . . . as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them.

44 U.S.C. § 3301. No records may be "alienated or destroyed" except pursuant to the disposal provisions of the FRA. Id. at § 3314.

If, as Ms. Goodridge represented, Department of Education employees are using or have used outside, non-governmental email addresses for government business and have not retained copies of those records on the Department's files, the Department is failing to "accurate[ly] and complete[ly] document[] the policies and transactions of the Federal Government," by failing to retain and/or properly dispose of federal records in violation of the FRA. 44 U.S.C. § 2902. Similarly, the failure to search for records in response to FOIA requests would also be unlawful. See 5 U.S.C. § 552, et. seq.

As you know, the administration of the Reading First program has been the subject of intense scrutiny following the issuance of your office's six reports on the program. In addition to CREW's FOIA request, press accounts indicate that reporters also have been requesting related Department documents under the FOIA. See e.g. Andrew Brownstein & Travis Hicks, Congress Grills Spellings on Reading First Progam; OIG Investigation Draws to a Close, Title I Monitor (undated) (attached as Exhibit 1). Similarly, on May 1, 2007, Rep. George Miller (D-CA), Chairman of the House Committee on Education and Labor, requested documents from Secretary

Mr. John P. Higgins, Jr.
May 15, 2007
Page 3

Spellings on Reading First and the student loan industry. Letter from Rep. George Miller to Hon. Margaret Spellings, Secretary, U.S. Department of Education (May 1, 2007) (attached as Exhibit 2).

In order for the Department to respond to these and all other requests in accordance with federal law, all responsive departmental records must be searched. If, however, employees are regularly using private email accounts to send official email and the Department neither tracks nor stores such email, the full complement of responsive records clearly will not be produced to any requesters.

By failing to maintain all departmental communications as federal records, the Department of Education is likely operating in violation of the Federal Records Act, and appears to have been doing so for some time. In addition, the use of private email accounts to conduct official Department business raises serious concerns about the adequacy of Department searches in response to FOIA requests. As a result, CREW respectfully requests that you commence an immediate investigation to assess the extent and duration of this disturbing practice, the amount of official correspondence that has been lost or destroyed, and the effect of this practice on all records requests to the Department of Education.

Thank you for your attention to this matter.

Sincerely,

Melanie Sloan
Executive Director

Encls.

cc:    Honorable Edward M. Kennedy, Chairman
       Honorable Michael B. Enzi, Ranking Member
       U.S. Senate Committee on Health, Education, Labor and Pensions

       Honorable George Miller, Chairman
       Honorable Howard P. "Buck" McKeon, Ranking Member
       U.S. House Committee on Education and Labor

Mr. John P. Higgins, Jr.
May 15, 2007
Page 4

     Honorable Henry Waxman, Chairman
     Honorable Thomas M. Davis, Ranking Member
     Ranking Member, U.S. House Committee on Oversight and Government Reform

     Dr. Allen Weinstein
     Archivist of the United States

**EXHIBIT 1**

-->


## THOMPSON
Insight you trust.

| Home | My page | Search | News Desk | Support | Resources | Contact us |



**Congress Grills Spellings On Reading First Program**
*OIG Investigation Draws to a Close*

By Andrew Brownstein and Travis Hicks

As an investigation of Reading First drew to a close and Congress geared up for hearings, top lawmakers publicly grilled Secretary of Education Margaret Spellings for the first time about her role in the program.

Declaring that the program has "an odor that I don't like," Sen. Tom Harkin, D-Iowa, chairman of the education appropriations subcommittee, asked her about claims by Mike Petrilli, a former political appointee at the department during President George W. Bush's first term, that she "micromanaged" the program when she was a domestic policy advisor in the Bush White House.

"Obviously, I was not micromanaging that program or any other grant program out of the thousands of grant programs" she dealt with as domestic advisor to the president, the secretary testified.

Spellings reiterated previous statements that problems with Reading First occurred before she became secretary. She said she removed the program's leaders and accepted all of the recommendations of the department's Office of Inspector General (OIG), which finished its six-part audit of the program with the release of two final reports in late February and March. Saying she'd "hate to throw the baby out with the bathwater," however, Spellings cited anecdotal evidence and state achievement data showing that the program is improving reading instruction for many of the nation's neediest students.

**Site Index**      "I am hugely concerned about the credibility of the department," she said. "But I also know that more students are being taught to read. This is a huge investment in reading instruction."

Spelling's appearance at the Senate hearing came two days after a similar reception before the House appropriations committee. Rep. David Obey (D-Wisc.), chairman of the committee, said that problems with the program "make it even more difficult to persuade a number of people, including me, to vote to renew programs like No Child Left Behind," of which Reading First is an integral part.

**Spellings and Publishers**

Questions surrounding Spelling's involvement in the early implementation of the program are likely to continue as hearings on Reading First convene in the House and Senate. In a statement, Rep. George Miller,D- Calif., chair of the House education committee, said hearings would begin in April. A report on Reading First from Congress' Government Accountability Office is expected on March 30.

Despite Spelling's attempts to distance herself from the controversy, previously released e-mails show that, as domestic policy advisor, she had a role in handling hot-button Reading First issues in Texas and New York City.

Additional e-mails, recently obtained under the Freedom of Information Act by the *Title I Monitor*, suggest that her role extended possibly further. One exchange between Reid Lyon, former chief of child development and behavior for the National Institutes of Child Health and Human Development, and Beth Ann Bryan, former senior advisor to the secretary at the Education Department (ED), centered on concerns that New York City would use Reading First funds on a program called Month by Month Phonics, which many experts believed was not in line with scientifically-based reading research.

Lyon, also known as Bush's unofficial "reading czar," forwarded Bryan a message from a top executive at Houghton Mifflin, a major publisher of reading materials. The executive warned that if New York City's action went unchecked it could jeopardize efforts by the publishing industry to change its textbooks to align with Reading First. "The actions in New York City have put an enormous chill over our people," said Maureen DiMarco, a senior vice president with the company. "They feel they have invested huge amounts of money and effort and have become educated to be true believers ... but if NYC is allowed to put in whole language and incidental phonics window-dressing, then they realize that the federal government has thrown in the towel on its effort and it will collapse faster than it took to create it."

In a forwarding message to Bryan, Lyon said, "Can you forward to Margaret? We have to discuss publishers today with

Margaret. We have been meeting with some CEOs from the industry and they want to play ball."

An ED spokeswoman declined to discuss any aspect of the Reading First program. In an interview, Lyon said he met twice with groups of publishers at the department at the request of the American Association of Publishers to discuss scientifically-based reading research (SBRR) and the kinds of funding mechanisms that were available to them. It would not have been surprising, Lyon said, for him to seek Spellings' help in emphasizing the importance of changing the textbook industry. Publishers, he said, "were a constituency that obviously played a major part in the previous reading failure rates" and, due to Reading First, also constituted "a hope for the future."

**Jumping Through Hoops**

Among other e-mails obtained by the *Monitor* are messages that show the pressure some state officials were under to obtain Reading First funds. Previously, Lyon and others have commented that the program required an aggressive approach because many states and districts wanted to "game" the system by using the new money for programs that were not allowed under the statute. Other e-mails obtained by the *Monitor* show that some state officials were pressured by governors and state legislators to do whatever it took to get the money.

In one such e-mail, Chris Doherty, the former head of the Reading First program, summarized for Susan Neuman, a former ED assistant secretary, a meeting he had with the education superintendent of a rust-belt state. Among the main points, Doherty quoted the superintendent as saying:

*"...[I am] under "an incredible amount of pressure" [due to] a governor who is "running on reading" and the election is looming

*"..."[my] Department is on the line here"... and "[my] job is on the line here, too."

*"Just tell us what hoops we need to jump through, Chris!"

*The governor is furious about all this!"

*"We have an incredibly tight time line, Chris!"

While noting that "the highest levels of the Department are aware of your situation and share your desire to make the necessary changes...as expeditiously as possible," Doherty said he told the superintendent that the state needed to bring its reading program in line with SBRR and suggested hiring an outside expert consultant to help with its application.

Doherty was forced to resign in September in the wake of the OIG investigation. In its final reports, the OIG focused on the appearance of bias and a lack of objectivity in training sessions for states on Reading First and among subcontractors who provided technical assistance for the program.

**A Strong Firewall**

The problems surrounding appearance of conflicts of interest were perhaps foreseeable due to two tenets that Reading First's leadership and many of the program's supporters accepted as axiomatic: namely that there was a limited pool of experts with sophisticated knowledge of scientifically-based reading research; and that, precisely due to their expertise, these scientists would more often than not have ties to commercial programs.

Picking up on this theme, the OIG said, "The Department did not consider associations with reading program publishers as a potential source of bias because officials thought it would limit the pool of technical assistance providers with expertise in SBRR. Consequently, appearances of bias and lack of objectivity contributed to the complaints surrounding the administration of the Reading First program, and led to the perception that some individuals may have been promoting products they were associated with and may have influenced the products that were being selected by" states and school districts.

In many ways, Reading First was an attempt to radically transform the market by instantly creating a demand for programs with SBRR. "I agree that the existence of Reading First certainly created a larger market for scientifically-based reading programs," said Sandi Jacobs, until recently a senior program specialist with the Reading First program. "It created a situation where suddenly thousands of schools were looking for SBRR programs that would not have before."

With a small pool of experts, many of whom had ties to publishers, the program leaders' operating premises created an environment where those who advised states on Reading First and those who created programs to be used under Reading First would often be the same people. According to critics, the system called for a strong firewall to keep the process from appearing or becoming incestuous. Why that didn't happen may also be a question for future hearings.

**Bias and Objectivity**

The legal issue, however, is complicated. The RMC Research Corporation of Portsmouth, New Hampshire operated three

contracts — totaling nearly $40 million — to provide technical assistance to states and districts on Reading First. Its contract with ED contained boilerplate federal conflict-of-interest language designed to prevent "the existence of conflicting roles that might bias a contractor's judgment" and stave off an "unfair competitive advantage."

But when RMC later subcontracted the actual operations to three regional centers — at the University of Texas, the University of Oregon, and Florida State University — the contracts did not contain the conflict-of-interest clause. The clause also was absent in consulting agreements between RMC and its technical assistance providers. As a result, the OIG said, "they may not have disclosed any actual or potential" conflicts of interest.

The conflict of interest standard is much more clear-cut, and at the same time, more limited, than the OIG's suggested standard of "bias or impaired objectivity." A conflict-of-interest standard would, at the very least, suggest that someone providing technical assistance for Reading First not have a connection to reading programs for students in kindergarten through the third grade, the program's constituency. But a technical assistance provider who has designed a McGraw-Hill math product, to use a hypothetical example, while perhaps not having a direct conflict of interest in recommending against a Harcourt reading program, might have "an appearance of bias or impaired objectivity" in connection to any McGraw-Hill product. The OIG acknowledged there "is no federal requirement that contractors, subcontractors or consultants be vetted for bias or impaired objectivity" but said that not having one damaged the "integrity and reputation" of RMC and the department.

### Honor System for Consultants?

The complexity of the issues involved actually led RMC in 2004 to suggest to the department that it set up a series of advisories on conflicts of interest, but ultimately, according to the OIG, ED "found the issues too complicated to lend themselves to advisories" and instead suggested that the centers bring questions to RMC as they arose.

In addition to many technical consultants, the report noted that the leaders of the three regional technical centers all had ties to reading programs, including McGraw-Hill, Pearson Scott Foresman and Voyager, Inc.

Marcy Stein, a professor of education at the University of Washington, served as a consultant for the Western Regional Technical Assistance Center based at the University of Oregon. An author with McGraw-Hill's Open Court reading series, Stein said she was careful to disclose her authorship and to stay out of program selection. She said did this on her own, and received no instructions from the Western center or RMC. "It was an ethical consideration left up to each individual how careful we were about negotiating these boundaries, "she said. "I thought it was common sense."

Asked, however, if detailed vetting would have helped or hindered the process, she said it would have significantly slowed down the program's early implementation. "Oh my God, I think it would have taken years to get off the ground," she said. "I don't know where they would have gotten the technical assistance from."

### Pressure on DIBELS

Nonetheless, despite detailing the lack of a clear conflict-of-interest firewall in RMC's contracts, the OIG only documented two instances where it believed consultants engaged in "inappropriate promotion" of a product. Both instances were previously reported by the *Monitor* in September 2005.

Officials from Kentucky and Nevada complained that RMC consultants pressured them to adopt the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a major assessment used in the Reading First program. One of the consultants was a paid trainer for DIBELS. In its report, the OIG stated that Doherty discussed the behavior of one of the consultants with an RMC official, saying "one of the knocks is that he overly pushes DIBELS."

Everett Barnes, RMC's president, said in an interview that Nevada had its application approved without DIBELS — although the state modified the application later to use the assessment. He added, moreover, that since ending his RMC contract, the consultant who served as a DIBELS trainer has not accepted any DIBELS contracts in states where he provided technical assistance.

Barnes said that RMC and the department examined consultants' resumes and backgrounds for signs of a "blatant suggestion of exploitation or promotion of a product."

"We didn't go lightly into this," he said, adding that "we knew there were people who were going to have perceptions of a 'plot,' for lack of a better term, on the part of the department or the President."

Nonetheless, he said, "we didn't know how to totally eliminate" those perceptions.

### Two Complaints

Jacobs, the former Reading First official, said it was significant that the OIG only turned up two instances in which appearances of conflicts among consultants translated into overt pressure.

"Two complaints — that's all they found," she said. "And you know why? Because there's nothing else to find. ...If, out of the hundreds and hundreds of [technical assistance] contacts, you have a few duds, that's a really good track record. That's one of the really frustrating things about the OIG. They look at a couple of incidents, and to them, it proves a pervasive pattern."

She lamented that the OIG has not focused on "how much this program has accomplished in a very short period of time when government programs typically don't accomplish anything in any length of time."
In addition to early anecdotal evidence and state achievement data, Jacobs cited the fact that the White House's Office of Management and Budget recently gave its highest rating—"effective"—to Reading First, the only No Child Left Behind program to get such a rating.

Gene Wilhoit, the executive director of the Council of Chief State School Officers, disagreed with Jacob's characterization that reports of pressure were limited to those two states, saying, "The problem with Reading First was not isolated to a couple of places."

Wilhoit said Reading First "went beyond what I thought was reasonable in [the] federal role." As superintendent of Kentucky, he complained to ED about the appearance of a conflict due to a consultant to the state advocating for DIBELS while working as a trainer for the test.

### Reading Leadership Academies

Accusations of bias related to DIBELS played a part in the OIG's earlier report on the Reading Leadership Academies, which were chiefly planned and organized by then-assistant secretary Susan Neuman in 2002. The three academies were designed to help state officials understand the complex requirements of the statute.

A handbook and guidebook on the academies both contained articles on DIBELS, which later became the most widely-used assessment in Reading First schools. DIBELS was "one of many screening tools on the market that could have been used to perform Reading First assessments," according to the OIG, but "only DIBELS was featured in the academy materials."

But the most controversial aspect of the academies were "Theory to Practice" sessions that offered examples of commercial programs that would be eligible for Reading First funds. The OIG found that the sessions "focused on a select number of reading programs." Out of 12 programs that were cited at the sessions over the course of three academies, six were Direct Instruction (DI), a program Doherty, Reading First's former director, championed prior to coming to the department. Open Court was cited three times, and three other products were cited once each.

The apparent narrowness of the choices sparked an immediate backlash. In comment evaluation forms, attendees said things like, "I think I'll go buy shares in Open Court!" and "I felt like I was in a Direct Instruction sales pitch all day."

Those opinions were apparently buttressed by officials involved in setting up the academies. A facilitator of the first academy, in an e-mail debriefing Doherty on the event, noted "too much emphasis on Direct Instruction," according to the OIG. An RMC consultant e-mailed Doherty after the first event to tell him "as everyone knows, Open Court and Direct Instruction can't be the only shows in town."

Doherty and Neuman declined to be interviewed for this article.

### SFA Shut Out

Robert Slavin is chairman of the Baltimore-based Success for All Foundation (SFA), one of three organizations that initially complained to the OIG. Slavin said the academies provided some of the clearest evidence that SFA was shut out of Reading First: SFA, along with Direct Instruction and Open Court, are the three reading programs that are widely acknowledged to have the greatest evidence of effectiveness; yet Direct Instruction and Open Court were amply represented at the sessions, while SFA was invisible.

"I still don't know why, but there is absolutely no way to argue that SFA was not excluded on purpose," Slavin said. "They knew the research on SFA, they knew how to find us, and they knew exactly what it would mean if DI and Open Court were given as examples and SFA was not. It would be like giving examples of high-quality Japanese cars and saying Toyota and Subaru. What about Honda?"

Lyon, who does not often find himself agreeing with Slavin about SFA's treatment under Reading First, agreed. "If you want to highlight programs based on SBRR, SFA is a prime example," he said. "For the life of me, I do not know why they did not."

*The two most recent OIG reports can be found at http://www.ed.gov/about/offices/list/oig/whatsnew.html*

# EXHIBIT 2

MAJORITY MEMBERS:

GEORGE MILLER, CALIFORNIA, Chairman

DALE E. KILDEE, MICHIGAN, Vice Chairman
DONALD M. PAYNE, NEW JERSEY
ROBERT E. ANDREWS, NEW JERSEY
ROBERT C. "BOBBY" SCOTT, VIRGINIA
LYNN C. WOOLSEY, CALIFORNIA
RUBÉN HINOJOSA, TEXAS
CAROLYN McCARTHY, NEW YORK
JOHN F. TIERNEY, MASSACHUSETTS
DENNIS J. KUCINICH, OHIO
DAVID WU, OREGON
RUSH D. HOLT, NEW JERSEY
SUSAN A. DAVIS, CALIFORNIA
DANNY K. DAVIS, ILLINOIS
RAÚL M. GRIJALVA, ARIZONA
TIMOTHY H. BISHOP, NEW YORK
LINDA T. SÁNCHEZ, CALIFORNIA
JOHN P. SARBANES, MARYLAND
JOE SESTAK, PENNSYLVANIA
DAVID LOEBSACK, IOWA
MAZIE HIRONO, HAWAII
JASON ALTMIRE, PENNSYLVANIA
JOHN A. YARMUTH, KENTUCKY
PHIL HARE, ILLINOIS
YVETTE D. CLARKE, NEW YORK
JOE COURTNEY, CONNECTICUT
CAROL SHEA-PORTER, NEW HAMPSHIRE

MINORITY MEMBERS:

HOWARD "BUCK" McKEON, CALIFORNIA,
Senior Republican Member

THOMAS E. PETRI, WISCONSIN
PETER HOEKSTRA, MICHIGAN
MICHAEL N. CASTLE, DELAWARE
MARK E. SOUDER, INDIANA
VERNON J. EHLERS, MICHIGAN
JUDY BIGGERT, ILLINOIS
TODD RUSSELL PLATTS, PENNSYLVANIA
RIC KELLER, FLORIDA
JOE WILSON, SOUTH CAROLINA
JOHN KLINE, MINNESOTA
CATHY McMORRIS RODGERS, WASHINGTON
KENNY MARCHANT, TEXAS
TOM PRICE, GEORGIA
LUIS G. FORTUÑO, PUERTO RICO
CHARLES W. BOUSTANY, JR., LOUISIANA
VIRGINIA FOXX, NORTH CAROLINA
JOHN R. "RANDY" KUHL, JR., NEW YORK
ROB BISHOP, UTAH
DAVID DAVIS, TENNESSEE
TIMOTHY WALBERG, MICHIGAN
DEAN HELLER, NEVADA



**COMMITTEE ON EDUCATION AND LABOR**

U.S. HOUSE OF REPRESENTATIVES

2181 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6100

MAJORITY – 202-225-3725
MINORITY – 202-225-4527
http://edlabor.house.gov

May 1, 2007

<u>VIA FACSIMILE- 202-401-0596</u>
The Honorable Margaret Spellings
Secretary
U.S. Department of Education
400 Maryland Avenue, SW, Rm. 7W301
Washington, DC 20202

Dear Secretary Spellings:

Over the past few weeks, the Committee on Education and Labor has held investigative hearings that produced evidence of unethical practices in the student loan industry and of pervasive mismanagement and conflicts of interest in the Reading First program. The Committee's ongoing investigations into these two multi-billion-dollar programs have uncovered significant lapses in oversight among senior level White House and Department of Education officials responsible for their stewardship.

For several years, the Administration has been aware of the unethical practices among lenders and schools participating in the federal student loan programs, yet has to act to protect the integrity of the $85 billion-a-year programs. Recent news accounts have cited formal warnings dating back to at least 2001 that highlighted the dangers of inducements and other prohibited activities if left unchecked. Similarly, warnings raised years ago about the overall mismanagement of the Reading First program – and of the failure to mitigate conflicts of interest in the program – were ignored by the Administration. This consistent failure to act in the interests of our nation's students raises significant questions about why such warnings have been ignored.

Given the preliminary results of our ongoing investigations and the daily public reporting of unethical practices in programs within the Education Department, I seek additional information about the Department of Education's stewardship of the government's student loan and Reading First programs.

I ask that you provide me with the details of all senior-level Department of Education communications regarding the unethical practices among student lenders and schools (e.g., prohibited inducements) and the design and implementation of the Reading First program beginning January 20, 2001, through the receipt of this request. Specifically, I request the communications of former Secretary of Education Rodney Paige; former Senior Advisor to Secretary Paige, Beth Ann Bryan; former Deputy Secretary William Hansen; former Under Secretary and Deputy Secretary Eugene Hickok; present Chief of Staff to the Secretary David Dunn; and any other senior-level staff with responsibilities for the student loan and Reading First programs. I am sending a similar request to the White House.

I respectfully request your written response within 10 days of receiving this letter. I further ask that your staff coordinate the production of the requested information with Michael Zola, Chief Investigative Counsel, House Education and Labor Committee at (202) ███-███.

Sincerely,


**GEORGE MILLER**
Chairman

cc: Senior Republican Member Howard "Buck" McKeon


Enclosure:  Information Request Supplemental Instructions

# EXHIBIT 8



### UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

June 20, 2007

Mr. Daniel C. Roth
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC 20005

RE: FOIA Request No. 07-00661-F

Dear Mr. Roth:

This letter is in response to your fax dated May 16, 2007 requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Your request was received in this office on May 17, 2007. You asked for the following information:

> Any records dating from January 20, 2001, through the present, from the following Department of Education offices:
>
> 1. Office of the Secretary, including the offices of the Chief of Staff and Senior Counselor,
> 2. Office of the Deputy Secretary,
> 3. Office of Elementary and Secondary Education,
> 4. any other office in which there are staff members whose duties include implementation of the No Child Left Behind Act of 2001,

of or relating to any contact with the following individuals or entities:

> 3. Ignite! Learning a/k/a Ignite!, or any officer or employee thereof,
> 4. Curriculum on Wheels a/k/a COWs,
> 5. Neil Bush,
> 6. Barbara Bush,
> 7. Ken Leonard,
> 8. Lori Anderson,
> 9. Ashleigh Snyder, and
> 10. Sid Rogich.

We are unable to process your request at this time. As you are aware, FOIA requests must reasonably describe the records that are sought in order for Department employees, with knowledge of the subject matter, to identify and locate potentially responsive documents. 5 U.S.C. § 552(a)(3)(A) (2000). Your request seeks access to "any records [of various Department offices] … of or relating to any contact [with specifically named individuals or entities]." Your request as stated does not describe the records sought with a reasonable amount of detail such that a Department employee would be able to locate potentially responsive documents with a reasonable amount of effort. See Dale v. Internal Revenue Service,

Page 2 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00661-F

238 F.Supp.2d 99 (D. D.C. 2002). Consequently, the Department is unable to process your request as it is currently stated.

## Fee Waiver

In addition, you have requested a fee waiver for your request. The requester bears the burden of justifying entitlement to a fee waiver. See Casad v. Department of Health & Human Services, 2003 U.S. Dist. LEXIS 13007 (D. D.C. June 20, 2003). To meet this burden, a requester must satisfy two statutory requirements before the Department may waive or reduce properly assessed fees: (1) disclosure of the information must be in the public interest because the information primarily benefits the general public and is likely to contribute significantly to public understanding of the operations or activities of the government; and (2) disclosure of the information must not be primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii)(2000); see also 34 C.F.R. § 5.64(a). Moreover, a requester must address both factors in sufficient detail in order for an agency to determine whether it can reduce or waive the fees. Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C. Cir. 2003).

In order to determine whether the disclosure of the information responsive to the request furthers the narrow public interest cognizable under the FOIA, the Department must consider the following four (4) factors in sequence:

5. The subject matter of the requested records themselves must specifically concern identifiable "operations or activities of the government";
6. In order for the disclosure to be "likely to contribute" to an understanding of specific government operations or activities, the disclosable portions of the requested information must be meaningfully informative in relation to the subject matter of the request;
7. The disclosure must contribute to the "understanding of the public at large," as opposed to that of the individual requester or a narrow segment of interested persons; and
8. The disclosure must "contribute significantly" to public understanding of government operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7, 2004); see also 34 C.F.R. § 5.64(b)(1) and (2). Only if all four elements have been met will the Department conclude that a requester has satisfied the first prong of the public interest element of the statutory requirement for a fee waiver.

Where the Department concludes that the public interest requirement has been met, it may waive or reduce applicable fees only where it also finds that "disclosure of the information . . . is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii)(2000). In order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

3. Does the request involve any "commercial interest of the requester" (if not, the requester satisfies the second prong of the statutory fee waiver test); and
4. If so, the agency must balance the requester's commercial interest against the identified public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee waiver or reduction may be granted only where the public interest in disclosure is greater in magnitude than the requester's commercial interest.

See also 34 C.F.R. § 5.64(b)(3).

Page 3 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00661-F

For your information, the Department does not customarily grant blanket waivers, but rather considers each waiver request on a case-by-case basis.

The Department has reviewed your request and denies the request because it fails to satisfy the first factor of the public interest analysis. As stated above, the first factor of the public interest analysis requires the subject matter of the requested records must specifically concern an identifiable operation or activity of the government. In order to satisfy this element, the requester must identify a nexus between the requested records and the benefit to the public. See Nat'l Treasury Employees Union v. Griffin, 811 F.2d 644 (D.C. Cir. 1987). Moreover, the requester must satisfy this burden with a level of specificity, beyond generalized statements that the request somehow relates to a government operation or activity. Judicial Watch v. U.S. Dep't of Justice, 122 F.Supp.2d 5, 9 (D. D.C. 2000); see Larson v. C.I.A., 843 F.2d 1481, 1483 (D.C. Cir. 1988).

In your request, you state, "these records are likely to contribute to the public's understanding of an educational product that is apparently being utilized by a quarter million public schools students in 19 states, the District of Columbia and Puerto Rico." As stated above, the Department has concluded that your request does not reasonably describe the records sought. Assuming for the sake of argument that your request did reasonably describe the records sought, you have not stated how the requested records relate to a specific government activity or operation. At most, you indicate that there are "at least thirteen school districts were reportedly paying for [the educational] Ignite! products with money received by the states under the No Child Left Behind Act of 2001." There are several Department programs that receive funds under the No Child Left Behind Act of 2001. Your request fails to identify a specific program under which a state might pay for educational products through funds made available pursuant to the No Child Left Behind Act of 2001. Without such information, your request is nothing more than a fishing expedition through government files.

In sum, the Department's denies your request for a fee waiver in the present case. Since you have failed to meet your burden regarding a fundamental threshold requirement of the legal standard for analyzing fee waiver requests under the FOIA, the Department cannot address the remaining factors of the fee waiver analysis. However, the Department may reconsider this decision should you choose to submit supplemental or clarifying information.

Fees are charged for searching/reviewing and duplication for responsive records. The fee is calculated in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III), 5 U.S.C. § 552(a)(4)(A)(iv)(II) and 34 CFR § 5.61. The search and the review fee are calculated based on the hourly rate of pay, plus 16% administrative charge and the duplication costs are ten cents per photocopied page. Our regulations, 34 CFR § 5.61 require us to allow you to modify your request if the cost is more than $25.00. In addition, in accordance with 34 CFR § 5.62(a)(2), if the cost is to be greater than $250.00, the requester must pay in advance.

You have the right to appeal this decision by writing, within 30 days of your receipt of this letter. Your appeal should be received by the FOIA office on or before July 25, 2007. Your appeal should be accompanied by a copy of your initial letter of request and this denial letter, and should contain any evidence or argument you wish the Department to consider in making an administrative determination on your appeal.

Page 4 of 4 Citizens for Responsibility and Ethics in Washington
No. 07-00661-F

## Appeal Address:

U.S. Department of Education
Chief Information Officer
400 Maryland Avenue, SW, FOB-6-2W311
ATTN: FOIA Appeals
Washington, DC 20202-4500

Once we receive your clarification and the issues regarding charges are resolved, we will begin processing your request. Please send your clarification letter to the U.S. Department of Education, ATTN: FOIA Office, 400 Maryland Avenue, SW, PCP 9th Floor, Washington, DC 20202-4700, or send it by e-mail: EDFOIAManager@ed.gov.

If you have any questions regarding this letter, please contact Angela Arrington or myself at 202-245-6615.

Sincerely,

Maria-Teresa Cueva
FOIA Public Liaison, OM/RIMS

# EXHIBIT 9



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF MANAGEMENT

ASSISTANT SECRETARY

**SEP 06 2007**

Daniel C. Roth, Esq.
Counsel
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, DC 20005
(and via e-mail to: droth@citizensforethics.org )

Re: FOIA Appeal—Request No. 07-00517-F (Fee Waiver)

Dear Mr. Roth:

I am writing in response to your June 21, 2007 letter appealing the Department's June 8, 2007 denial of CREW's request for a waiver of fees in connection with its March 28, 2007 request for Department records pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, administratively denominated Request No. 07-00517-F. I regret the delay in responding to your appeal.

Background

Your Request No. 07-00517-F, as modified by e-mail communication dated May 21, 2007, sought access to "any and all documents and records from January 20, 2001 to the present, in the offices of: 1) The Secretary; 2) Senior Counselor; 3) Chief of Staff; 4) Deputy Secretary; 5) Management Improvement Team; 6) Elementary and Secondary Education; 7) Institute of Education Sciences; 8) Planning Evaluation and Policy Development; 9) Civil Rights; 10) Innovation and Improvement; 11) Special Education and Rehabilitative Services; 12) Management; 13) Chief Financial Officer; and 14) Communications and Outreach, in the following categories:[1]

1. All communications . . . to, from, or referencing any member of the White House staff, including, but not limited to, then-Domestic Policy Advisor Margaret Spellings or Margaret LaMontagne, that mention or relate to Reading First, Early Reading First, "Scientifically Based Reading Research"/"Science Based Reading Research"/"SBRR," or DIBELS.

---

[1] Your request also sought access to a fourth category of documents: "To the extent not included in the above request, . . . all documents previously disclosed under FOIA to Andrew Brownstein, Travis Hicks, and/or the Title I Monitor. Your fee waiver appeal does not concern this aspect of your request because the Department has already responded to it in full. Appeal, p. 2.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-4500
www.ed.gov

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

Page 2—Mr. Roth

    2.  All communications . . . , including calendar references and meeting notes, with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and IntelliTools.

    3.  All communications . . . , including calendar references and meeting notes, that mention or relate to contacts with the executives, employees, consultants, or contractors of the following educational publishers: Houghton Mifflin (including, but not limited to, Maureen DiMarco), SRA McGraw Hill, Pearson Scott Foresman, Voyager (including, but not limited to, Randy Best), Cambium Learning, Sopris West, and IntelliTools.

Your request also asked for a waiver of associated processing fees. Your fee waiver request and a clarifying e-mail communication dated May 11, 2007[2] asserted: (1) that the records sought concern the operations of the federal government; (2) that their disclosure to CREW would likely contribute significantly to the public's understanding of the extent of White House involvement in the administration of the Department's Reading First program (which enhancement CREW would accomplish by analyzing the responsive records and sharing such analysis with the public via memoranda, reports, or press releases, and/or by disseminating the responsive records on an interactive website for public analysis and comment); and (3) that the request was made primarily for non-commercial purposes.

The Department denied your fee waiver request by letter dated June 8, 2007,[3] on the ground that you had not met your burden to demonstrate that disclosure of the records responsive to your request would contribute significantly to public understanding of government operations or activities. Specifically, the Department's fee waiver denial letter stated, in pertinent part:

> The Department's April 16, 2007 letter to you outlined in detail the legal standard for analyzing fee waiver requests and assessing whether a waiver or reduction of fees is appropriate; that standard is referred to and incorporated by reference herein.
>
> . . . [T]he Department assumes, for the sake of argument, that the documents responsive to items 1 through 3 of your FOIA request meet the first two elements of the public interest prong of the fee waiver analysis because they are presumed to relate to the Department's administration of the Reading First program. The Department has also concluded that, based upon the information contained in your May 11, 2007 e-mail, items 1 through 3 of your request meet the third element of the public interest prong of the fee waiver analysis. Nevertheless, the Department finds that you have not met your burden

---

[2]  Your May 11, 2007 e-mail communication was characterized by you as "an informal appeal" of the Department's April 16, 2007 letter initially denying your fee waiver request.

[3]  The June 8, 2007 denial of your fee waiver request followed up on the following additional communications between the parties: (1) the Department's April 16, 2007 letter initially denying your fee waiver request; (2) a conference call in which the parties discussed CREW's possible narrowing of the scope of its FOIA request; (3) your May 11, 2007 e-mail communication, informally appealing the Department's April 16, 2007 fee waiver denial; and (4) your two e-mail communications dated May 14 and May 21, 2007, concerning modifications to CREW's FOIA request.

Page 3—Mr. Roth

with regard to the fourth element of the public interest prong of the fee waiver analysis, i.e., the requirement that disclosure of the records in question "contribute significantly" to public understanding of government operations or activities.

The Department found it unlikely that the public's understanding of the subject of the request – the Department's administration of the Reading First program – would be significantly enhanced, vis-à-vis its level of understanding prior to disclosure, because: (1) many of the voluminous documents at issue in your fee waiver request could not in any way enhance the public's understanding of the Reading First program, much less do so significantly, inasmuch as they concern other program matters; (2) your fee waiver request argued that disclosure of the documents at issue would clarify the public record with respect to alleged "significant inconsistencies . . . as to the involvement of Secretary Spellings in the administration of Reading First prior to her becoming Secretary of Education," but failed to demonstrate a nexus between such alleged but unspecified "inconsistencies" and the contents of the documents at issue; and (3) that several sources of information on the Department's contacts with educational publishers already exist in the public domain, notwithstanding your argument to the contrary.  Your appeal ensued.

<u>Decision on Appeal</u>

Based upon a careful review of the correspondence between the parties, the nature of your request and the information it sought, the arguments asserted in your appeal, and applicable legal precedent, I find that the Department properly denied your request for a fee waiver.  The reasons for my decision are set forth below.

<u>Legal Standard for Fee Waivers Under FOIA</u>

The FOIA authorizes agencies to recover from requesters certain costs associated with processing requests for access to government records.  5 U.S.C. § 552(a)(4)(A)(i) and (ii) (2000). The statute further provides for the waiver of such fees in whole or in part where disclosure of the information [requested] is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.  5 U.S.C. § 552(a)(4)(A)(iii) (2000); <u>see also</u> 34 C.F.R. § 5.64(a).  The requester bears the burden of justifying entitlement to a fee waiver.  <u>See Casad v. Department of Health and Human Services</u>, 2003 U.S. Dist. LEXIS 13007 (D.D.C. June 20, 2003).  As stated in the Department's April 16, 2007 letter, and discussed below, fee waiver determinations turn on the consideration of six factors.  To demonstrate entitlement to a waiver of fees, a requester must not only request a waiver, but also address these factors in sufficient detail to enable an agency to determine whether it can reduce or waive the fees.  <u>See Judicial Watch, Inc. v. Rossotti</u>, 326 F.3d 1309 (D.C. Cir. 2003).  The Department may not waive or reduce fees unless it makes the requisite findings regarding both the public interest and primary interest.  34 C.F.R § 5.64(a).

Page 4—Mr. Roth

Public Interest Prong

Once a requester has asserted a right to a waiver of fees, he or she must meet the first prong of the statutory test by supporting the request with evidence that establishes that disclosure of the information sought is in the public interest. 5 U.S.C. § 552(a)(4)(A)(ii) (2000). In order to determine whether the disclosure of the information responsive to a request furthers the narrow public interest cognizable under FOIA – i.e., significant contribution to increased public understanding of the operations of the government – the Department must consider the following four factors in sequence:

1.  The subject matter of the requested records themselves must specifically concern identifiable "operations or activities of the government" (in some instances, certain documents contained in records responsive to a request will meet this requirement while others will not);
2.  In order for the disclosure to be "likely to contribute" to an understanding of specific government operations or activities, the disclosable portions of the requested records must be meaningfully informative in relation to the subject matter of the request;
3.  The disclosure must contribute to the "understanding of the public at large" as opposed to that of the individual requester or a narrow segment of interested persons; and
4.  The disclosure must "contribute significantly" to public understanding of government operations or activities.

See Judicial Watch, Inc. v. Department of Justice, No. 03-5093, 2004 WL 980826 (D.C. Cir. May 7, 2004); see also 34 C.F.R § 5.64(b)(1) and (2).  Only if a requester establishes all four elements of the public interest test outlined above, will the Department find that the first prong of the statutory requirement for a fee waiver has been satisfied.

Primary Interest Prong

Where an agency determines that the public interest requirement for a fee waiver has been met, it may waive or reduce applicable fees only where it also finds that "disclosure of the information is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii) (2000). In order to determine whether this second requirement has been satisfied, the Department must consider the following two factors in sequence:

1.  Does the request involve any "commercial interest of the requester" (if not, the requester satisfies the second prong of the statutory fee waiver test); and
2.  If so, the agency must balance the requester's commercial interest against the identified public interest in disclosure for the purpose of ascertaining which is the "primary interest"; a fee wavier or reduction may be granted only where the public interest in disclosure is greater in magnitude than the requester's commercial interest.

See also 34 C.F.R Section 5.64(b)(3).

Page 5—Mr. Roth

Discussion

The Department concluded, for the purposes of its initial determination on your fee waiver request – and I do so here – that you had met your burdens as to Factors 1, 2, and 3 of the public interest prong of the two-part test outlined above. Nevertheless, the Department denied your fee waiver request based on a determination that you had failed to meet your burden, under Factor 4 of the public interest prong, to show how disclosure of the requested records will contribute "significantly" to the public's understanding of government operations and activities; in this regard, the initial decision noted that significance is measured by a likely enhancement of the public's understanding of the subject at issue as a result of the disclosure, compared to the public's level of understanding of that same issue prior to disclosure. D.C. Technical Assistance Org. v. Dep't of Housing and Urban Development, 85 F. Supp. 2d 46, 49 (D.D.C. 2000); see also Judicial Watch, Inc. v. U.S. Department of Justice, supra, 185 F. Supp. 2d at 62.[4]

Your appeal argues: (1) that the Department's denial was based in error on CREW's original March 28, 2007 request rather than on the "narrowed" request elucidated in your May 21, 2007 e-mail submission; (2) that the documents responsive to your request would significantly enhance public understanding relative to "serious inconsistencies" in the public record with respect to Secretary Spellings' involvement in Reading First prior to her tenure as Secretary; (3) that the information sought in Items 2 and 3 of the request "will likely contribute significantly to the public's understanding of the extent to which publishers were in contact with the Department and [A]dministration personnel during the Reading First development and grant process"; and (4) to the extent [the records sought] go beyond Reading First, they will shed light on the operations of the federal government, and therefore meet the public interest requirement for a fee waiver. For the following reasons, I do not find that any of these arguments states a basis for granting your appeal.

With respect to your first argument, it does appear that the Department's denial analyzed your fee waiver request in the context of your original March 28, 2007 request rather than the modified request submitted on May 21, 2007. However, your appeal mischaracterizes the modified request as, simply, "narrowed" in scope. Rather, while the modified request is narrower than the original in some respects (e.g., narrowed scope from Department-wide to 14 offices representing approximately one half of the Department's components; elimination of "any other issue related to reading instruction or education" from Item 1; elimination of catchall "including but not limited to" language in Items 2 and 3), it is significantly broader in other respects (e.g., the addition of new name search terms in all three items; the addition of a new program – Early Reading First – in Item 1; the addition of "calendar references and meeting notes" to Item 3). In any event, your argument fails even to address, much less effectively to challenge, the Department's finding that your request is overbroad to qualify for a fee waiver because many of the responsive documents are unrelated to the subject of your request – the Department's administration of the Reading First program. For example, the responsive time frame for all items of the request, commencing January 20, 2001, antedates by a year the creation of the Reading First program; and all items of the request seek access to communications

---

[4]  As CREW failed to meet its burden with respect to the public interest prong of the fee waiver test, it is unnecessary to analyze whether it has satisfied the requirements of the primary interest prong.

Page 6—Mr. Roth

concerning matters other than Reading First.  That is true for CREW's March 28, 2007 request and remains so for the May 21, 2007 modification.

Your first argument concludes:

> The Department cannot and does not argue that the records sought will not enhance the public's understanding of the operations of the federal government.  This is all that the fee waiver provision of the FOIA requires of a requester that [sic] has shown that the information sought is not primarily in its commercial interest.  See 5 U.S.C. § 552(a)(4)(A)(3).

June 21, 2007 Appeal, p. 4.  The quoted passage both misstates the law (omitting the word "significantly" from the cited statutory provision) and speaks to an element of the fee waiver test not at issue (i.e., Factor 3 of the public interest prong, as to which the Department found CREW had met its burden).

I also find your second argument – that the documents responsive to your request would significantly enhance public understanding relative to "serious inconsistencies" in the public record with respect to Secretary Spellings' involvement in Reading First prior to her tenure as Secretary – unpersuasive.  Initially, I note, notwithstanding the references in your submissions to "serious inconsistencies" in the plural, the examples cited in fact represent statements regarding a single inconsistency attributed to a number of different sources.  In any event, this inconsistency has been widely reported, as evidenced by the examples you have provided.  However, none of your submissions demonstrates how the documents responsive to your request – other than Item 1 documents that specifically reflect Ms. Spellings' involvement or lack of involvement with Reading First before coming to the Department, if such documents exist – would enlighten the public as to either the alleged inconsistency or the broader subject of the Department's administration of the Reading First program.

Your third argument – that the information sought in Items 2 and 3 of the request "will likely contribute significantly to the public's understanding of the extent to which publishers were in contact with the Department and [A]dministration personnel during the Reading First development and grant process" – is made for the first time on appeal.  In any case, I find this argument unpersuasive because it makes no connection between Department contacts with educational publishers while Reading First was being developed and the Department's later administration of the program.  I note as well that this argument does not even suggest a connection between documents responsive to Items 2 and 3 that are unrelated to Reading First and the Department's administration of that program, much less show how the disclosure of such documents would inform the public in a significant way about Reading First.

And finally, I find your argument that, to the extent the records sought go beyond Reading First, they will shed light on the operations of the federal government, and therefore meet the public interest requirement for a fee waiver, similarly without merit.  Your argument is conclusory and utterly lacking in specificity sufficient to meet the requester's burden: in essence, you state that unidentified records will shed light on unspecified activities not of this Department but, rather, of the "federal government."  It follows, logically, that you fail to show how disclosure of such

Page 7—Mr. Roth

materials will increase public understanding of the Department's operations or activities in a significant way.

For all of these reasons, I must deny your appeal.

<u>Right to Judicial Review</u>

This letter constitutes exhaustion of the administrative remedies available to you under FOIA. You have the right to judicial review of this decision, pursuant to 5 U.S.C. § 552(a)(4), in the United States District Court for the district in which you reside, in which you have your principal place of business, in which the records are maintained, or for the District of Columbia.

                              Sincerely,

                              Michell Clark
                              Michell Clark